**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**William J. BENSON, Defendant–
Appellant.**

**No. 90–1572.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 25, 1991.

Decided Aug. 27, 1991.

Ruben Castillo, Joel D. Bertocchi (argued), Asst. U.S. Attys., Crim. Div., Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Jeffrey A. Dickstein (argued), Missoula, Mont., for defendant-appellant.

Before MANION and KANNE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

MANION, Circuit Judge.

In a second superseding indictment, a grand jury charged William Benson with willfully failing to file income tax returns for 1980 and 1981, 26 U.S.C. § 7203, tax evasion for 1981, 26 U.S.C. § 7201, and perjury. (The district court dismissed the perjury charge before trial.) In 1980 and 1981, a single taxpayer (as was Benson) was required to file an income tax return if he received gross income exceeding $3,300. The indictment alleged that in 1980 and 1981 Benson received unreported income exceeding $3,300 from three sources. First, the indictment alleged that in 1980 and 1981 Benson received compensation for investigative services performed for attorney Andrew Speigel. Second, the indictment alleged that in 1981 Benson fraudulently received Social Security disability benefits he was not entitled to by working while concealing the fact that he was able to work. Finally, the indictment alleged that in 1981, Benson received interest income. The interest income by itself was not sufficient to require a return; consequently, the government's case depended upon proving that either the investigative fees or the Social Security payments were gross income to Benson.

At trial, Benson contended that he was and still is completely disabled, that he never intended to mislead anybody about his employment status, and that he was entitled, or at least in good faith believed he was entitled, to the Social Security benefits. Since Social Security benefits were not gross income unless fraudulently received, Benson contended that the benefits to him were not gross income. As to the investigative fees, Benson contended they were really proceeds of a nontaxable personal injury settlement he made with an insurance adjuster. Benson also claimed that he relied on his attorney's advice that the investigative fees were not taxable (because they were really proceeds of a settlement), and therefore his failure to report them was not willful. The jury, however, convicted Benson on all counts.

On appeal, Benson raises a plethora of issues; one, however, is dispositive. Because we conclude the district court abused its discretion in admitting purported expert testimony from an IRS agent, we reverse Benson's conviction.

## I. Factual Background

Taken in the light most favorable to the government, the evidence showed the following. In the late 1960's, Benson, while working for Bethlehem Steel Corporation, contracted encephalitis. The encephalitis caused Benson to develop a seizure disorder that rendered him unable to work. In 1968, Benson applied for and was granted Social Security disability benefits. Social Security regulations allow people to receive disability benefits only if they are physically unable to perform "substantial work" or "substantial gainful employment." A recipient is required to notify the Social Security Administration concerning any return to work or change in his physical condition that might enable him to work. Yet, despite the notification requirement, from the early 1970's through 1980 and 1981, Benson was employed in several jobs—including bartending at a bowling alley and cocktail lounge, work as a criminal investigator for the Illinois Department of Revenue (IDOR), and investigative work

for Speigel—without telling the Social Security Administration.

Benson's work as an investigator for Speigel arose from Benson's employment with IDOR. In 1970, Benson began to work for IDOR as an informant. Eventually, Benson began to perform all (or at least most of) the tasks IDOR's regular investigators performed. In late 1974, Benson and IDOR entered into an employment contract. The original contract called for Benson to work between 120 and 300 hours per month (approximately 30 to 60 hours per week) and for IDOR to pay Benson $750 per month, a sum that included reimbursement for Benson's expenses. In November 1975, Benson and IDOR signed a new contract that increased Benson's salary to $840 per month for the same amount of work. IDOR fired Benson in June 1976.

In 1975 and 1976, a number of lawsuits were filed against IDOR agents, including Benson. Those suits alleged false arrests arising from an IDOR investigation of violations of Illinois' cigarette tax laws. At that time, IDOR was covered under a liability insurance policy issued by Continental Insurance Company. Continental's adjuster was Underwriters Adjusting Company (Underwriters). IDOR did not tell Underwriters that Benson was an employee, so Underwriters did not consider Benson to be covered under the Continental policy. Eventually, however, Benson persuaded Underwriters that he was an employee entitled to coverage.

In July 1980, Benson told Charles Rhodes, Underwriters' Chicago branch manager, that he had done substantial investigative work on his own cases, and that Underwriters should pay him for that work. Rhodes told Benson to have Speigel (who was representing Benson in the cigarette tax cases) verify that Benson's work was necessary to his defense. Speigel wrote Rhodes a letter telling Rhodes that Speigel had employed Benson as an investigator and that he was billing Benson's time at $15 per hour. Rhodes agreed to pay the investigative fees, and Speigel's periodic bills to Underwriters began to include regular charges for Benson's investigative work.

After being dismissed as a defendant in the cigarette tax cases in 1981, Benson told Rhodes that the insurance company should pay him for investigative work he had done on his cases in 1976, 1977, and 1978. Rhodes agreed, and Speigel soon began sending bills that included charges for Benson's investigative work during this time, which Underwriters paid. All told, Underwriters paid Benson approximately $10,000 in 1980 and $101,000 in 1981.

According to Benson, IDOR's failure to tell Underwriters that he was an employee, a failure that resulted in Continental's denial of insurance coverage, was part of a campaign to harass and punish him for exposing corruption at IDOR. Benson claimed that the payments from Underwriters were part of an agreement he reached with Rhodes to settle any potential First Amendment claims against Underwriters for its alleged participation in IDOR's harassment. According to Benson, the settlement payments were disguised as investigative fees at Rhodes' suggestion because he wanted to keep the settlement secret so he would not jeopardize Continental's insurance business with the state (business that brought Continental all of $1,741 in 1979 and nothing in 1980, 1981, 1982, and 1983). Benson and Speigel testified that Benson told Speigel about the settlement, and the proposed method of payment, and that Speigel went along. Benson and Speigel also testified that Speigel told Benson that the payments were not gross income for tax purposes, since they were settlement proceeds. Rhodes, however, testified that no secret settlement ever existed, and that the payments were compensation for investigative services. Furthermore, Speigel's letter to Rhodes stated that Benson had performed investigative services; Speigel's bills contained charges for investigative fees; no written settlement agreement existed; and Benson never executed a release of claims against Continental or Underwriters.

## II. Testimony of IRS Agent Cantzler

As its final witness, the government presented Internal Revenue Agent Gary Cantzler. Cantzler's purpose was to summarize the government's trial evidence and give his expert opinion as to why that evidence showed that Benson was required to file income tax returns in 1980 and 1981. Cantzler explained to the jury the filing requirements for 1980 and 1981. He also explained certain tax law concepts, such as gross income and taxable income. Cantzler calculated, based on the trial testimony, Benson's income for 1980 and 1981, and his income taxes due for 1980 and 1981.

During his testimony, Cantzler specifically opined that the payments from Underwriters and the Social Security Administration in 1980 and 1981 were gross income to Benson. To conclude that those payments constituted gross income, Cantzler first had to conclude that Benson received payments from Underwriters as fees for investigative services rather than as the result of a settlement, and that Benson was not entitled to the Social Security benefits he received. Based on the testimony and exhibits presented in the government's case, Cantzler identified specific factors supporting his conclusions that the payments from Underwriters were fees for investigative services, that the payments from Underwriters were not on account of a settlement, and that Benson was not entitled to receive Social Security disability benefits.

To fully understand any possible problem with Cantzler's testimony, it is necessary to set out some (though not all) of the factors Cantzler cited to support his conclusions. Among the factors Cantzler cited to support his conclusion that the payments from Underwriters were payments for investigative fees and not on account of a settlement were: invoices from Speigel to Underwriters for "Investigative fees"; Speigel's letter to Underwriters stating that he was employing Benson as an investigator; Speigel's 1980 tax return, which listed the money Speigel paid to Benson as a business expense for "investigator fees"; bills prepared by Benson for investigative fees; an affidavit Speigel executed in April 1981 stating that he had paid Benson as an investigator; the fact that Benson had never sued Underwriters, and had no claim against it; Rhodes' denial that any settlement existed; an analysis of two depositions Benson gave in which he gave contradictory accounts of how he arrived at the per hour charge and number of hours charged on his bills for investigative fees, and about whose idea (Benson's or Rhodes') it was to prepare the bills; and Rhodes' denial that he told Benson to prepare the bills. Among the factors Cantzler cited to support his conclusion that Benson was not entitled to Social Security benefits were: testimony by Marie Meinardi that Benson had worked for her as a bartender, and had worked as a bartender at a bowling alley; Benson's work for IDOR; testimony by Richard Dunn, an ex-IDOR employee, that Benson's employment contract with IDOR was a fraud on the Social Security Administration and that Benson had discussed his situation anonymously with the Social Security Administration and was told he would owe $20,000 back to the Social Security Administration; Benson's failure to tell Social Security employee DeVries that he worked for Meinardi; Benson's telling Social Security investigator Klaprat that his work for IDOR was part of a rehabilitation program when he knew it was not; Benson's failure to inform Bethlehem Steel (his former employer from which he was receiving disability payments), Metropolitan Life Insurance Company (from which he received a waiver of life insurance premiums because of his disability), or his treating physician that he was working full-time; and Benson's deposition testimony stating that he did not know why he had not reported his jobs to the Social Security Administration and that if he was guilty of fraud, so were others.

Benson objected to much of Cantzler's testimony early and often during trial, on a number of different grounds. Benson now argues on appeal that the district court abused its discretion in allowing Cantzler to recapitulate the government's evidence (much of which was disputed) and opine as to whether the money Benson received from Underwriters was for investigative

services rather than payment of a settlement and that Benson was not entitled to receive Social Security disability benefits. We agree that much of Cantzler's testimony was not properly admissible as expert testimony.

■ Federal Rule of Evidence 702 states that "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." The touchstone of admissibility under Rule 702 is helpfulness to the jury. The crucial question is, " 'On *this subject* can a jury from *this person* receive appreciable help.' " 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 702[1], at 702–7 to 702–8 (1990) (quoting Wigmore, *Evidence* § 1923, at 21 (3d ed. 1940)) (emphasis supplied by Wigmore). An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion; the opinion must be an *expert* opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert. See *United States v. Lundy*, 809 F.2d 392, 395–96 (7th Cir.1987); cf. *Mid–State Fertilizer v. Exchange Nat'l Bank*, 877 F.2d 1333, 1340 (7th Cir.1989) (rejecting an economist's "expert" opinion that drew on inferences from the record rather than any economic expertise).

■ Much of Cantzler's testimony consists of nothing more than drawing inferences from the evidence that he was no more qualified than the jury to draw. This problem is most apparent in Cantzler's testimony about why Benson was not entitled to Social Security disability benefits. The ultimate question concerning the Social Security benefits was whether Benson received those benefits knowing he was not entitled to them. Cantzler was no more qualified than the jury was to answer this question, and offered no special knowledge or skill that would be particularly helpful in arriving at an answer. Nothing in the

record indicates Cantzler had any particular knowledge of Social Security law, or any other expertise that would give him any special insight into the mind of a person trying to cheat the Social Security Administration.

■ Moreover, as the government itself notes, Cantzler was required to rely in large part "on the testimony of certain witnesses whose credibility was vigorously attacked by Benson" and open to serious question. In other words, Cantzler had to make credibility determinations. Credibility is not a proper subject for expert testimony; the jury does not need an expert to tell it whom to believe, and the expert's "stamp of approval" on a particular witness' testimony may unduly influence the jury. See *United States v. Azure*, 801 F.2d 336, 339–41 (8th Cir.1986); *United States v. Samara*, 643 F.2d 701, 705 (10th Cir.1981). This is not to say that an expert witness may not give testimony that, if accepted, will lead the jury to disbelieve a witness. Suppose, for example, that a defendant in a suit involving an automobile accident testifies that he was travelling 15–20 miles per hour when he entered an intersection and hit plaintiff's car. An accident reconstruction expert testifies, however, that based on his analysis of the angle of deflection, damage to the two cars, his estimate of the point of impact, the two cars' final resting positions, and other factors, that the defendant had to be travelling at least 40 miles per hour when he entered the intersection. That is useful expert testimony because it is based on specialized knowledge that is not within the average layman's ken. If the jury accepted that testimony, it would necessarily disbelieve the defendant but that is no reason for refusing to admit the testimony. Cantzler's testimony was different, though. He had no reason based on any special skill or knowledge he possessed for believing, for example, that Meinardi was telling the truth when she testified that Benson worked for her, or that Rhodes was telling the truth when he denied any secret settlement existed between Benson and Underwriters. Cantzler did not give helpful ex-

pert testimony that cast another witness' testimony in a good or bad light; instead, he simply told the jury whom to believe.

The government relies on our decision in *United States v. Windfelder*, 790 F.2d 576 (7th Cir.1986), to support the admission of Cantzler's testimony. In *Windfelder* we held as a general matter that "[e]xpert testimony by an IRS agent which expresses an opinion as to the proper tax consequences of a transaction is admissible evidence. Similarly ... an IRS expert's analysis of the transaction itself, which necessarily precedes his or her evaluation of the tax consequences, is also admissible." *Id.* at 581. The government contends that Cantzler's testimony was admissible because it was simply his analysis of the transactions that produced taxable income to Benson.

■ The government reads too much into *Windfelder*. An IRS agent may be allowed to testify as an expert about his analysis of a transaction, but only if his testimony qualifies as expert testimony. That testimony must still involve the application of some special skill or knowledge that will help the jury understand the case. In *Windfelder*, the IRS experts' opinions "were based on their evaluation of evidence (the tax returns and related financial documents) that was within the area of their special expertise." *Id.* at 581–82. The experts in *Windfelder* used their "expertise in accounting and tax matters" in reaching their conclusions. *Id.* at 581. That is not the case with much of Cantzler's testimony. For example, it takes no particular expertise in tax or accounting matters to conclude from invoices and bills that on their face say "investigator fees" that they probably are for investigator fees. And Cantzler's opinion that Benson was not entitled to Social Security benefits required no application of any tax or accounting expertise. There was no complex transaction that had to be broken down so the jury could understand it, no tax law concept or accounting principle to explain. The jury was every bit as qualified to analyze the evidence concerning Benson's receipt of Social Security benefits as was Cantzler, and

Cantzler had nothing to offer on this question that would assist the jury's understanding of the issue.

■ We conclude that it was an abuse of discretion to admit much of Cantzler's testimony. But, does that error require reversal? The trial judge concluded after hearing all of Cantzler's testimony and reflecting on it that he had made a mistake by admitting it. But the judge characterized that mistake as "probably a harmless mistake." Benson's attorney conducted a thorough cross-examination of Cantzler, exposing his lack of qualification to opine on many of the matters he did. The judge instructed the jury that it was free to accept or reject Cantzler's testimony. As one commentator has noted in discussing the issue of whether to admit expert testimony, generally "[t]he jury is intelligent enough, aided by counsel, to ignore what is unhelpful in deliberations." 3 *Weinstein's Evidence* ¶ 702[02], at 702–30.

■ The government, however, has placed all its bets on the argument that Cantzler's testimony was proper; it has not argued that even if it was error to admit that testimony, the error was harmless. Harmless error, like any other argument, may be waived by failing to argue it. *United States v. Giovannetti*, 928 F.2d 225 (7th Cir.1991). We may overlook a failure to argue harmless error, *id.* at 226–27, but in this case we will not. Despite the district court's opinion that the error was harmless, and the other factors we have discussed weighing in favor of finding harmless error, we are not prepared to say from an unguided search of the lengthy trial record that admitting Cantzler's testimony was harmless. The government's case was not overwhelming; indeed, the credibility of several of its most important witnesses was open to serious question. It may be that Cantzler's status as an "expert" bolstered the credibility of those witnesses enough to make a difference to the trial's outcome. Since the government has waived the contention that admitting Cantzler's testimony was harmless error, and since we are not convinced we should

disregard that waiver in this case, we must reverse Benson's conviction.

This does not mean that in any retrial the government may not present relevant expert testimony from an IRS agent. But that testimony must actually be expert testimony; the agent must apply his expertise in a way that is helpful to the jury. For example, assuming the agent has sufficient experience in analyzing settlements, it would be perfectly appropriate for the agent to discuss what business practices and documents he would expect to see if a settlement really existed, compare that to the documents and practices in this case, and express an opinion as to whether a settlement really did exist. The district court must assure, however, that the expert's opinion is based on analysis that is within his area of expertise; the expert may not simply recapitulate the trial evidence and express an opinion based on that evidence and on his judgment of witness credibility.

### III. Other Issues

Even though we are reversing this case, we must decide several other arguments Benson raises that if accepted would require dismissing charges against him. In the interest of judicial economy, we will also discuss several issues Benson raises that are likely to recur on retrial.

### A. *Speedy Trial Act violation*

■ Benson contends that the district court should have dismissed, with prejudice, the failure to file counts, which were charged in the original indictment, and the tax evasion count, which was added in the first superseding indictment, because the Speedy Trial Act period had run out before trial. The Speedy Trial Act provides that the government must bring a criminal defendant to trial no more than 70 days after the later of the indictment date or the date of the defendant's initial appearance before a judicial officer of the court in which the charge was pending. 18 U.S.C. § 3161(c)(1). In this case, two and one-half years passed between Benson's initial appearance and trial. The Speedy Trial Act,

however, excludes certain time periods in calculating the number of allowable days between initial appearance and trial. See 18 U.S.C. § 3161(h). Benson does not challenge the excludability of most of the time that passed between his initial appearance and trial. Instead, his Speedy Trial Act challenge is confined to challenging the excludability of the period between September 22, 1988, and October 31, 1988, the date the government filed its first superseding indictment against him.

The dispute arises from the following facts. On August 22, the district court granted the government's motion to disqualify Speigel as Benson's trial counsel (on the ground that Speigel was to be a trial witness) and ordered Benson to find a new trial attorney. On September 22, Benson's new attorney entered his appearance. At that time, the court was ready to rule on pretrial motions Speigel and Benson had already filed. But Benson's new attorney requested an opportunity to review the motions already filed and to file new motions if necessary. The court initially granted 10 days to file new motions and to challenge the court's rulings on the already-filed motions. Benson's attorney did not think 10 days was sufficient and asked for a month, noting that in any event he could not "see trying this case much before January." After some more discussion, the court finally granted Benson's attorney 20 days to file his pretrial motions.

After this discussion, the topic of a superseding indictment arose. The government had previously discussed filing a superseding indictment to add a tax evasion count to the original two failure to file counts. The prosecutor told the court she could present the superseding indictment to the grand jury and file it with the court in two weeks. The judge then reset the due date for filing motions to "20 days after the superseding indictment is returned," which the court assumed would be two weeks from September 22. The court subsequently issued a written order giving Benson's attorney until October 26 to file pretrial motions, and another order ruling on the already-pending pretrial motions.

The problem arises in this case because the government did not file the superseding indictment until October 31. Benson's attorney did not file any pretrial motions before then, based on the logical conclusion that there was no point in filing motions until he knew what was in the superseding indictment. On November 3, the court extended the deadline for filing motions. Benson ultimately filed several motions, one of which was a motion to dismiss for violating the Speedy Trial Act.

The district court denied Benson's motion to dismiss. We agree with that decision. The district court's written order specifically set aside the period from September 22 until October 26 to file pretrial motions. This court has held several times that any time the district court expressly allows for filing motions is excludable under the Speedy Trial Act. See, e.g., *United States v. Barnes*, 909 F.2d 1059, 1065 (7th Cir. 1990); *United States v. Piontek*, 861 F.2d 152, 154 (7th Cir.1988); *United States v. Montoya*, 827 F.2d 143, 153 (7th Cir.1987); *United States v. Tibboel*, 753 F.2d 608, 610 (7th Cir.1985). Therefore, the 34–day period between September 22 and October 26 was excludable. Even if the period from October 26 until November 3 (the date the district court extended the motions filing period) is counted as time running on the Speedy Trial Act clock, only eight of the 35 days left on the clock on September 22 expired. Since Benson does not challenge the excludability of any other time periods, there was no Speedy Trial Act violation.

### B. Validity of the Sixteenth Amendment

■ Benson argues that he did not need to file tax returns or pay income taxes because the Sixteenth Amendment was not properly ratified. (Although this is a typical "tax protester" argument, see, e.g., *United States v. Thomas*, 788 F.2d 1250, 1253 (7th Cir.1986), Benson's failure to file returns had nothing to do with any general tax protest, and this case is not a tax protester case.) The district court denied Benson's request for an evidentiary hearing on this issue and refused to hear any Sixteenth Amendment argument.

As the district court noted, we have repeatedly rejected the claim that the Sixteenth Amendment was improperly ratified. See, e.g., *United States v. Foster*, 789 F.2d 457, 461–63 (7th Cir.1986); *Thomas*, 788 F.2d at 1253; *United States v. Ferguson*, 793 F.2d 828, 831 (7th Cir.1986); *Lysiak v. C.I.R.*, 816 F.2d 311, 312 (7th Cir.1987) (per curiam). Accord *United States v. Sitka*, 845 F.2d 43 (2d Cir.1988); *United States v. Stahl*, 792 F.2d 1438 (9th Cir.1986). One would think this repeated rejection of Benson's Sixteenth Amendment argument would put the matter to rest. But Benson seizes on language in *Foster* in which, after rejecting the Sixteenth Amendment argument, we stated that "an exceptionally strong showing of unconstitutional ratification" would be necessary to show that the Sixteenth Amendment was not properly ratified. 789 F.2d at 463. Benson is the co-author of *The Law That Never Was*, a book that purports to "review the documents concerning the states' ratification of the Sixteenth Amendment" and to show "that only four states ratified the Sixteenth Amendment [and that] the official promulgation of the amendment by Secretary of State Knox in 1913 is therefore void." *Thomas*, 788 F.2d at 1253. Benson insists that as the co-author of *The Law That Never Was*, and the man who actually reviewed the state documents "proving" improper ratification, he is uniquely qualified to make the "exceptionally strong showing" we spoke of in *Foster*. Because of this, Benson insists, the district court should have at least granted him an evidentiary hearing on the Sixteenth Amendment issue.

Benson is wrong. In *Thomas*, we specifically examined the arguments made in *The Law That Never Was*, and concluded that "Benson ... did not discover anything." We concluded that Secretary Knox's declaration that sufficient states had ratified the Sixteenth Amendment was conclusive, and that "Secretary Knox's decision is now beyond review." See 788 F.2d at 1254. It necessarily follows that the district court correctly refused to hold an evidentiary hearing; no hearing is necessary to consider an issue that is "beyond review."

## C. Denial of Benson's post-trial motions

After the court entered the jury's verdict, Benson filed a "Motion to Dismiss or, in the Alternative, for a New Trial," pursuant to Fed.R.Civ.P. 33. In that motion, Benson argued that the court was required to set aside the verdict because the government knowingly presented perjured testimony from several witnesses, including Marie Meinardi, who testified that she had employed Benson as a bartender in 1971 and 1972. Benson also argued alternatively that the court was required to hold a new trial because the verdict was against the weight of the evidence. In particular, Benson attacked the credibility of government witnesses Rhodes, who testified about Benson's dealings with Underwriters, and Dunn, who testified among other things that Benson had admitted defrauding the Social Security Agency. Benson argues that the district court erred in denying his motion. The government responds that the court correctly denied the motion because it had no authority to grant it in the first place. We agree with the government.

■ Federal Rule of Criminal Procedure 33 provides that new trial motions must be filed within seven days after the verdict "or within such further time as the court may fix within the 7–day period." Federal Rule of Criminal Procedure 45(b) provides that the court may not extend Rule 33's time limit except as provided in Rule 33. The jury delivered its verdict on December 7, 1989. After discharging the jury, the court gave Benson ten days to file post-trial motions. Benson's attorney then requested sixty days, but the court refused that request. Instead, the court granted Benson ten days to file his motions and an additional 30 days to file supporting memoranda. The court specifically told Benson that the 10–day deadline was "jurisdictional." Despite that, Benson filed no post-trial motions within the 10–day period. Instead, on December 15, Benson filed a motion to extend the deadline until January 3, 1990. The district court granted this motion on December 20, two days after the 7–day period in Rule 33 for granting extensions ended. (The period ended December 18, not December 14, because Fed.R.Crim.P. 45(a) excludes weekends in computing time periods of eleven or fewer days.)

Under Rules 33 and 45(b), the district court's original order giving Benson 10 days to file his motions was proper, since the court entered that order within the original 7–day filing period. However, the extension granted on December 20 was ineffective because the court granted that extension outside Rule 33's 7–day limit. Since Benson did not file his new trial motion within the 10–day period the district court originally set, the motion was untimely. Since the motion was untimely, the district court had no authority to decide the motion. *United States v. Hocking,* 841 F.2d 735, 736 (7th Cir.1988). It follows that we must affirm the district court's decision to deny Benson's motion, because it could not be error for the court to deny a motion it had no authority to grant.

■ The district court attempted to save Benson's untimely motion by entering an order *nunc pro tunc* on January 4, 1990, granting Benson 40 days to file his new trial motion as of December 7, 1989. The court reasoned that on December 7 it had "intended" to give Benson 40 days to file his motions but that it had "effected [its] intentions poorly" by mistakenly granting ten days to file motions and an additional 30 days to file supporting memoranda. The fact remains, however, that the court did not originally grant Benson 40 days to file motions; it granted him ten days. An express grant of ten days (whether mistakenly made or not) is difficult to reconcile with an "intent" to grant 40 days. More importantly, to allow the district court to retroactively extend the time to file motions would subvert our holding in *Hocking* that the time limits in Rules 33 and 45(b) "define judicial power to act." 841 F.2d at 737.

As we noted in *Hocking,* courts occasionally allow trial judges to rule on untimely post-trial motions, despite provisions forbidding the extension of time to file, in certain "unique circumstances" in which

the judge induces a party to rely to his detriment on an erroneous extension of time. See *id.* at 737; cf. *Varhol v. National R.R. Passenger Corp.*, 909 F.2d 1557, 1568–72 (7th Cir.1990) (Flaum, J., concurring) (in some unique circumstances district court may rule on untimely new trial motion despite Fed.R.Civ.P. 59's 10–day limit and Fed.R.Civ.P. 6(b)'s prohibition of extension); *Government of the Virgin Islands v. Gereau*, 603 F.2d 438, 442 (3d Cir.1979) (per curiam) (untimely motion for reduction of sentence). Benson does not make any "unique circumstances" argument, however. Even if he did, it would fail because he cannot show detrimental reliance on the district court's mistaken statement that the rules set a 10–day rather than a 7–day limit. As we have seen, the court had the authority to extend the time limit to ten days. And, the court specifically told Benson that the 10–day deadline was jurisdictional, a statement that should have put Benson on notice that an irrevocable deadline approached. If Benson had indeed relied on the district court's misstatement, he would have filed his motions within ten days, and the court could have properly considered them. As it is, Benson's motion was late, his tardiness does not fall into any exception to the rules' deadlines, and the district court could not have properly granted the motion.

### D. Evidence of Social Security fraud

■ The government alleged that in 1981, Benson was required to report Social Security disability payments he fraudulently received by concealing his employment from the Social Security Administration. Benson argues that the district court should have excluded evidence of his scheme to fraudulently obtain Social Security payments because that evidence was evidence of another wrong act prohibited by Fed.R.Evid. 404(b). Rule 404(b) does not apply to the Social Security fraud evidence, though, because evidence of the Social Security fraud was "intricately related" to the failure to file charges. See *United States v. Sophie*, 900 F.2d 1064, 1074, 1076 (7th Cir.1990); *United States v. D'Antoni*, 874 F.2d 1214, 1216–17 (7th Cir. 1989). Social Security payments are not gross income unless fraudulently obtained. To prove that the Social Security payments were gross income to Benson, the government had to prove he obtained them by fraud. Evidence of Social Security fraud was not evidence of another act covered by Rule 404(b); it was direct evidence of an essential part of the crime charged.

■ Benson complains that the Social Security fraud evidence was more prejudicial than probative. See Fed.R.Evid. 403. But all evidence of the crime charged against a defendant is (or at least is supposed to be) prejudicial. Direct proof of the charged offense does not create the *unfair* prejudice Rule 403 is meant to prevent. Benson argues that in this case, however, the government had charged other sources of income that were more than sufficient to trigger the filing requirement. But the government is entitled to try to prove all of the sources of Benson's income, so that it might obtain a conviction even if the jury rejects one of its theories. The government is not required to try Benson with less than all of its evidence.

### E. Impeachment of Speigel

When cross-examining Speigel, the government attempted to elicit testimony that Speigel had once publicly stated that people chosen for jury duty in criminal tax cases should vote "not guilty" to cure the "problem" of criminal tax prosecutions. The government offered this testimony to impeach Speigel's fidelity to the oath he took before testifying. Benson objected to the government's questioning but after considerable discussion the district court allowed the government's questioning to proceed.

■ It is difficult to determine from Benson's brief the exact basis for his objection to this questioning. Benson seems to argue that evidence of the statement was not relevant. But jurors take an oath to follow the law as the judge instructs. Speigel's statement advised jurors in criminal tax cases to vote not guilty, regardless of the law. Though he did not say it in so

many words, one could interpret Speigel's statement as advocating to potential jurors that they should disregard their oaths in criminal tax cases. Logically, this evidence tended to show that Speigel might not regard an oath as binding. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Fed.R.Evid. 401. Since Speigel's credibility was a "fact ... of consequence to the determination of the action," and his statements logically bore upon his credibility, evidence of the statements is relevant under Rule 401.

■ Benson also mentions that the questioning created prejudice, apparently because it would tend to make the jury less inclined to believe Speigel's testimony and thus less inclined to accept Benson's defense that he relied in good faith on Speigel's advice in not filing income tax returns. Benson is apparently raising an argument based on Fed.R.Evid. 403. However, the jury was entitled to hear evidence that would help it determine whether Speigel was telling the truth when he testified. The district court moved to cure any unfair prejudice by instructing the jury to use Speigel's statements only to judge Speigel's credibility and not to hold Speigel's statements against Benson. Moreover, Benson had ample opportunity to rehabilitate Speigel on cross-examination. The district court carefully considered whether or not to allow the government's questions concerning Speigel's statements, and did not abuse its discretion in deciding that the statements' probative value was not substantially outweighed by their potential for unfair prejudice.

### F. Immunity instruction concerning Speigel

■ Speigel was called to testify before the grand jury but invoked his Fifth Amendment right not to incriminate himself. Speigel testified before the grand jury and at Benson's trial only after being granted immunity under 18 U.S.C. § 6002. At the government's urging, and over Ben-

son's objection, the district court gave an instruction explaining to the jury that Speigel

received immunity, that is, a promise from the government that any testimony or other information he provided would not be used against him in a criminal case, except in a prosecution for perjury. You may give [Speigel's] testimony such weight as you feel it deserves, keeping in mind that it must be considered with great caution and great care.

Benson contends that the district court erred by giving the immunized testimony instruction because the instruction is meant to protect the defendant from the sometimes unreliable testimony of a witness to whom the government grants immunity to testify against the defendant. Benson cites no authority for this proposition, but it seems to make sense. If somebody receives a favor from the government to testify (such as immunity) one could logically conclude that the witness might shade his testimony in his benefactor's favor. As such, the instruction can be translated to say, "Be careful that the witness isn't shading his testimony for the government in exchange for immunity." Following this reasoning, it seems to make little sense to give the immunized testimony instruction at the government's request: it is unlikely that a witness would shade his testimony (or, in other words, lie) in the *defendant's* favor in return for a benefit received from the *government*.

However, this circuit has recently upheld a district court's decision to give the immunized witness instruction at the government's request, explaining that such an instruction aids the jury in assessing the witness's credibility. *United States v. Lawrence*, 934 F.2d 868, 872–73 (7th Cir. 1991). And in any event, we think it unlikely that the instruction would have had much, if any, effect on the jury's decision in this case. First, the instruction ultimately left the decision to the jury to give Speigel's testimony "such weight as you feel it deserves." Second, the instruction told the jury that Speigel's testimony could be used against him in a perjury prosecu-

tion if he lied; in other words, immunity does not excuse lying. Third, the logic of Benson's own argument suggests that if the instruction would cause the jury to look askance at any of Speigel's testimony, it would be the testimony he gave favoring the government. Why tell lies that hurt your benefactor (that is, false testimony that favors Benson), especially when your benefactor has the power to prosecute you for perjury for those lies? It was not reversible error to give the immunity instruction.

### G. Vindictive prosecution

Benson moved in the district court to dismiss the charges against him because the decision to prosecute him was based on an improper vindictive motivation. The district court denied Benson's motion without allowing discovery or holding an evidentiary hearing. On appeal, Benson contends he made a sufficient showing of vindictive prosecution to at least require discovery and an evidentiary hearing.

 The Fifth Amendment has been interpreted to prohibit the government from prosecuting a defendant because of some specific animus or ill will on the prosecutor's part, or to punish the defendant for exercising a legally protected statutory or constitutional right. See *United States v. Goodwin*, 457 U.S. 368, 372, 102 S.Ct. 2485, 2488, 73 L.Ed.2d 74 (1982); *United States v. DeMichael*, 692 F.2d 1059, 1061–62 (7th Cir.1982); *United States v. Adams*, 870 F.2d 1140, 1145 (6th Cir.1989). To compel discovery on a vindictive prosecution claim, a defendant "must show a colorable basis for the claim. A colorable basis is some evidence tending to show the essential elements of the claim." *United States v. Heidecke*, 900 F.2d 1155, 1159 (7th Cir. 1990). To obtain a hearing, the defendant must meet a somewhat higher burden; he must "offer sufficient evidence to raise a reasonable doubt that the government acted properly in seeking the indictment." *Id.* at 1160.

 Benson points to three circumstances that he contends raise a colorable claim of vindictive prosecution. First, Ben-

son claims that while an IDOR employee, he exposed considerable corruption within that department, for which he has been paying ever since by having to endure a "campaign of harassment" by Illinois officials. As part of that campaign, he contends, the attorney who opposed him in litigation he brought against IDOR (see *Benson v. Allphin*, 786 F.2d 268 (7th Cir. 1986)) referred the original fraud case against him to the United States Attorney's office. Benson, however, does not explain how the state's attorney's vindictiveness demonstrates any vindictiveness on the federal prosecutor's part. Cf. *United States v. Schoolcraft*, 879 F.2d 64, 67 (3d Cir. 1989). The unsupported claim that the United States Attorney acted in concert with the vindictive state officials is not sufficient to raise a colorable vindictive prosecution claim.

 Second, Benson points to the fact that he co-authored *The Law That Never Was*. Benson claims that because of this the IRS classified him as a "tax protestor" and singled him out for prosecution and conviction in an effort to discredit him. But prosecuting those who lead others to go astray serves to deter those who might otherwise violate the law, a legitimate interest the government may consider in deciding whether to prosecute. See *Wayte v. United States*, 470 U.S. 598, 613, 105 S.Ct. 1524, 1533, 84 L.Ed.2d 547 (1985). In any event, Benson has presented no evidence to show that the government prosecuted him for his views rather than for his substantive tax law violations. Benson does point to three short notices of his conviction that appeared in the press. Only one of these notices mentions anything about tax protestors, and one does not even mention *The Law That Never Was*. While Benson labels these notices as "IRS press releases," there is nothing in the notices themselves that shows they came from the IRS. Benson was prosecuted for failing to report and evading taxes on approximately $100,-000 of income. Benson has not even tried to show that it is in any way unusual for the government to prosecute people who

have avoided paying taxes on over $100,-000.

■ Finally, Benson claims that the then-United States Attorney, Anton R. Valukas, prosecuted him for publicly speaking out about Valukas's financial disclosure statement. In March 1986, Benson obtained Valukas's financial disclosure statement. Benson called Valukas's office and left a message saying that he intended to give a speech in which he would disclose alleged improprieties in the statement. According to Benson, when Valukas returned the call he threatened to sue Benson. Benson also claims that Valukas called him a "common criminal" after Benson questioned Valukas at a public meeting about his ownership of stock in Bally Manufacturing Company and passed out copies of Valukas's financial disclosure statement after the meeting.

Assuming the statements Benson attributes to Valukas were made (and this is just an assumption), they did not necessarily require discovery concerning vindictive prosecution. Benson not only had to produce evidence of some animus or retaliatory motive—which the statements could provide—he also had to produce evidence tending to show that he would not have been prosecuted absent that motive. Under the facts of this case, the district court did not clearly err in holding that Valukas's alleged hostility towards Benson was not sufficient to require further discovery.

The Justice Department's internal regulations place final responsibility for criminal tax prosecutions with the Assistant Attorney General for the Tax Division. *United States Attorneys' Manual*, §§ 6–2.212, 6–218. Under those regulations, Valukas could not prosecute Benson without the Tax Division's approval. *Id.* at §§ 6–2.240, 6–2.245–47. The government submitted to the district court *in camera* the records of its authorization from the Tax Division to prosecute Benson. Those documents showed that the United States Attorney received the Tax Division's approval before prosecuting Benson. After reviewing the authorizing documents, the district court concluded that Benson's prosecution resulted from a proper exercise of authority.

■ Benson argues that he submitted evidence showing that the Justice Department, IRS, and United States Attorney did not follow every procedure normally followed before prosecuting. But failure to follow internal operating policy in prosecuting is not enough by itself to require discovery on a vindictive or selective prosecution claim. See *United States v. Mitchell*, 778 F.2d 1271, 1276 (7th Cir.1985). The important point is that the Tax Division had to, and did, approve the prosecution. Unless the Tax Division was nothing more than a rubber stamp for the United States Attorney, or had some vindictive motive of its own (and Benson has produced evidence of neither), the fact that the Tax Division had the final say in deciding whether to prosecute makes it "improbable" that prosecutorial vindictiveness was the reason for Benson's prosecution. Cf. *Heidecke*, 900 F.2d at 1159–60; *Schoolcraft*, 879 F.2d at 68 (both holding that in federal prosecution after failed state prosecution, the role of the federal prosecutor in finally deciding to prosecute renders it unlikely that state's possible motive for retaliation would have caused the prosecution).

Also undercutting any claim that the prosecution resulted from Valukas's pique is the fact that Benson has not shown that it is unusual for the government to prosecute people who avoid paying taxes on over $100,000. This fact distinguishes this case from *Adams*, on which Benson relies heavily. In *Adams*, the defendant argued that she was prosecuted for filing false tax returns only because she had sued the EEOC, her former employer, for discrimination. 870 F.2d at 1141. In remanding the case for discovery concerning vindictive prosecution, the court placed great emphasis on evidence the defendant presented showing that criminal prosecutions were unusual in cases such as hers. *Id.* at 1141, 1144–45. Where the prosecution is not an unusual one, it is much less likely that the government prosecuted out of some vindictive motive.

In sum, the district court correctly decided that the evidence Benson submitted, in the context of the facts of this case, did not warrant the "unusual step," *id.* at 1146, of allowing Benson discovery concerning the issue of prosecutorial vindictiveness. That being the case, the district court did not err in denying Benson's motion to dismiss for vindictive prosecution.

### H. *Reliance on counsel instruction*

At trial, Benson contended that he did not willfully fail to file income tax returns based on the payments from Underwriters, or evade taxes on those payments, because he sought and acted on Speigel's advice in determining whether the payments from Underwriters were taxable. Benson and Speigel both testified that Benson told Speigel that the payments from Underwriters resulted from a settlement with Underwriters; Speigel told Benson that money received from such a settlement was not taxable. Benson tendered an instruction to the court concerning his "advice of counsel" defense which stated:

> The defendant claims that he is not guilty of willful wrongdoing because he acted on the basis of advice from his attorney.
>
> If the defendant before taking any action sought the advice of an attorney whom he considered competent, in good faith and for the purpose of securing advice on the lawfulness of his possible future conduct, and made a full and accurate report to his attorney of all material facts of which he has the means of knowledge, and acted strictly in accordance with the advice of his attorney given following his full report, then the defendant would not be willfully doing wrong in omitting something the law requires, as that term is used in these instructions.

The district court rejected Benson's proposed instruction and instead gave the government's proposed instruction: The government's instruction was similar to Benson's but differed in two main respects. First, the government's instruction told the jury that Benson's reliance on counsel was a circumstance that it could consider in determining whether Benson acted willfully, rather than a complete negation of willfulness. Second, the government's instruction told the jury not to consider Benson's reliance if his reliance was not reasonable. Benson contends that these two differences constitute reversible error.

■ Generally, a defendant's mistake about what the law requires is no defense to a criminal prosecution; "the common law presumed that every person knew the law." *Cheek v. United States,* — U.S. —, 111 S.Ct. 604, 609, 112 L.Ed.2d 617 (1991). But because of the tax laws' complexity, Congress ameliorated this general rule by providing that certain criminal tax offenses (such as the ones charged against Benson) be "willful." *Id.* A "willful" violation requires "a voluntary, intentional violation of a known legal duty." *Id.* 111 S.Ct. at 610 (citing *United States v. Pomponio,* 429 U.S. 10, 12, 97 S.Ct. 22, 23, 50 L.Ed.2d 12 (1976) (per curiam)). To prove a willful violation, therefore, the government must show "that the law imposed a duty on the defendant, the defendant knew of the duty, and that he voluntarily and intentionally violated that duty." *Id.*

Benson's reliance on counsel defense is essentially a claim that he did not act willfully. If a person who truly does not know what the law requires seeks in good faith advice from counsel and is given wrong advice that he nonetheless believes (and has no reason to disbelieve), he does not act willfully in following that advice. A person who has a good faith belief that he is not violating the law does not act willfully. "[O]ne cannot be aware that the law imposes a duty upon him and yet be ignorant of it, misunderstand the law, or believe that the duty does not exist." *Id.* at 611.

■ According to Benson, it was wrong to tell the jury that reliance on counsel was but a "circumstance" to consider in assessing whether he acted (or failed to act) willfully because it allowed the jury to convict him even if the jury found that he honestly believed and in good faith acted upon Speigel's advice—or, in other words, that he acted in honest igno-

rance of his legal duty to file a return and pay income tax. That is not so in this case, for at least two reasons. First, neither Benson's proposed instruction nor the instruction the court actually gave mentioned any requirement that the jury find Benson acted on Speigel's advice in good faith or that Benson honestly believed Speigel's advice and thus acted in honest ignorance of his legal duties. Seeking and relying on counsel's advice is not by itself a defense. See *United States v. Conforte*, 624 F.2d 869, 876 (9th Cir.1980) (Kennedy, J.); *United States v. Poludniak*, 657 F.2d 948, 959 (8th Cir.1981). Reliance on counsel's advice excuses a criminal act only to the extent it negates willfulness and to negate willfulness counsel's advice must create (or perpetuate) an honest misunderstanding of one's legal duties. If a person is told by his attorney that a contemplated course of action is legal but subsequently discovers the advice is wrong or discovers reason to doubt the advice, he cannot hide behind counsel's advice to escape the consequences of his violation. See *Poludniak*, 657 F.2d at 659. Since Benson's proposed instruction did not require the jury to find that he relied *in good faith* on Speigel's advice, reliance on that advice, as Benson framed the issue, could be no more than a circumstance to consider in assessing willfulness.

In any event, the instructions as a whole were sufficient to inform the jury not to convict Benson if it believed that he was ignorant of his legal duties to file a return and pay taxes. The court correctly instructed the jury that "willfully" means "the voluntary and intentional violation of a known legal duty" and that a failure to act is willful only "if done voluntarily and intentionally, as distinguished from accidentally, inadvertently or negligently." The court also instructed the jury that "[a] good faith belief that payments made by [Underwriters] were an insurance settlement ... negates willfulness." A jury believing Benson actually believed and in good faith relied on Speigel's advice could not convict Benson based on the Underwriters payments in light of these instructions. Indeed, a separate reliance on counsel in-struction may be superfluous. We have held before that where the court properly instructs the jury on good faith and willfulness, a separate reliance on counsel in-struction is unnecessary. *United States v. Kelley*, 864 F.2d 569, 573 (7th Cir.1989). In light of the instructions as a whole, and the way Benson himself framed the reliance on counsel issue, it was not error to instruct the jury that reliance on counsel was a "circumstance" to consider in evaluating willfulness.

This brings us to Benson's second complaint about the reliance on counsel instruction, namely that the instruction allowed the jury to consider Benson's reliance only if that reliance was reasonable. In this respect, the instruction seems to run head on into the Supreme Court's holding in *Cheek*. Cheek contended as a defense to charges that he willfully failed to file income tax returns and willfully evaded taxes that he honestly believed wages were not income. On appeal, this court held that the district court correctly instructed the jury that "an honest but unreasonable belief is not a defense." *United States v. Cheek*, 882 F.2d 1263, 1267, 1268 (7th Cir. 1989). The Supreme Court disagreed and reversed Cheek's conviction. According to the Court, whether or not Cheek's belief that wages are not income was objectively reasonable was irrelevant to whether Cheek acted willfully or, in other words, whether Cheek voluntarily and intentionally violated a known legal duty. 111 S.Ct. at 611. To be sure, the reasonableness of a belief is a factor for the jury to consider in determining whether a defendant actually believed and acted on it. The more far-fetched a belief is, the less likely it is that a person actually held or would act on that belief. *See id.* at 611–12. "[B]ut it is not contrary to common sense, let alone impossible, for a defendant to be ignorant of his duty based on an irrational belief that he has no duty...." *Id.* at 611.

When a defendant contends that he did not act willfully because he had an honest misunderstanding of what the law requires, and that he came by that misunderstanding because of a lawyer's incorrect

advice, it is wrong to tell the jury that it may consider the defendant's reliance on that advice as a defense only if that reliance was reasonable. Following such an instruction, the jury might very well conclude that if the attorney's advice is objectively unreasonable (for example, advice that wages are not income), reliance on that advice would be unreasonable, and might very well convict the defendant even though it concluded he honestly believed that what he was doing was legal. If Benson raises a reliance on counsel defense at retrial, and the evidence supports an instruction on that defense,[1] the district court may instruct the jury that the reasonableness of the advice is a factor it may consider in determining Benson's good faith reliance on that advice; the court may not, however, instruct the jury to disregard Benson's reliance if it finds the advice (or reliance) unreasonable.

## IV.

Benson has presented numerous issues with little focus, usually an ineffective method of arguing an appeal. In this case, however, one issue has merit. Because the district court abused its discretion in admitting much of Cantzler's testimony, we must reverse Benson's conviction.

REVERSED.

KANNE, Circuit Judge, dissenting.

In typical fashion for a tax case, the government called an expert to summarize the complex evidence it had presented in its case in chief. "The nature of a summary witness' testimony requires that he draw conclusions from the evidence presented at trial." *United States v. Esser,* 520 F.2d 213, 218 (7th Cir.1975), *cert. denied,* 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976). A summary witness need not necessarily be an expert, but experts in accounting and other disciplines regularly give summary evidence of the sort envisioned by Federal Rule of Evidence 1006. 5 D. LOUISELL & C. MUELLER, FEDERAL EVIDENCE § 599, at 540 (1981). *See, e.g., United States v. Kapnison,* 743 F.2d 1450, 1557–58 (10th Cir.1984) (under Rule 1006, IRS agent allowed to give testimony summarizing exhibits and testimony), *cert. denied,* 471 U.S. 1015, 105 S.Ct. 2017, 85 L.Ed.2d 299 (1985); *United States v. Lemire,* 720 F.2d 1327, 1346–50 (D.C.Cir.1983) (under Rule 1006, FBI agent who was Certified Public Accountant allowed to summarize bank transactions and testimony of witnesses), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984).

In a case strikingly similar to the present one, we held that "[e]xpert testimony by an IRS agent which expresses an opinion as to the proper tax consequences of a transaction is admissible evidence." *United States v. Windfelder,* 790 F.2d 576, 581 (7th Cir.1986). We also noted that "an IRS expert's analysis of the transaction itself, which necessarily precedes his or her evaluation of the tax consequences, is also admissible evidence." *Id.*

With regard to the expert testimony admitted by a district judge, we are required to sustain his decision unless it was manifestly erroneous. *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). The key transaction in this case concerns whether or not the payments received by Benson from the insurance company and Social Security Administration were fraudulently obtained—thus making such payments taxable income.

In light of the language in *Windfelder,* 790 F.2d at 581 and *United States v. Toushin,* 899 F.2d 617, 620 n. 4 (7th Cir. 1990), I do not believe that permitting the government's expert witness to testify concerning his analysis of the transaction (pay-

---

1. It might be that what Benson presents as his reliance on counsel defense did not really touch on a misunderstanding about any legal duty, the Court's concern in *Cheek.* The only advice Speigel gave to Benson—based solely on Benson's representation that the payments from Underwriters were for a settlement—was that settlement payments are not taxable. Nobody disputed the propriety of this advice. The only question in this case was factual: were the payments from Underwriters really on account of a settlement? We leave it to the parties and court at any retrial to determine the propriety of an advice of counsel instruction, based on the evidence at that trial.

ment of insurance and Social Security benefits), which necessarily preceded his evaluation of the tax consequences could be deemed manifestly erroneous. It is certainly arguable that an IRS agent could qualify as an expert by knowledge, skill, experience, and training to give an opinion on the existence of fraud for the purpose of determining taxable income. The wide discretion afforded the district judge should enable him to determine whether the transaction analyzed by the IRS agent fell within the purview of his expertise.

Even if a finding of manifest error could be made with regard to the admission of the expert's summary testimony, I disagree with the majority's rejection of the application of the harmless error doctrine. The district judge initially made a determination that any error he may have made in admitting the agent's testimony was harmless. In determining whether the district judge committed manifest error, we must necessarily address this harmless error determination, as it was incorporated into the decision to allow the testimony to remain in evidence.

For the foregoing reasons, I respectfully dissent from the reversal of the conviction.