UNITED STATES of America,
Plaintiff–Appellee,

v.

Alayne B. ADAMS (87–5388), Mayo L. Coiner (87–5424),
Defendants–Appellants.

Nos. 87–5388, 5424.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 16, 1988.

Decided April 3, 1989.

Rehearing Denied June 5, 1989.

Kemper B. Durand and Kathleen L. Caldwell (argued), Memphis, Tenn., for defendants-appellants.

W. Hickman Ewing, Jr., U.S. Atty. and Devon L. Gosnell (argued), Memphis, Tenn., for plaintiff-appellee.

Before NELSON and NORRIS, · Circuit Judges, and SPIEGEL, District Judge.[*]

DAVID A. NELSON, Circuit Judge.

Alayne Adams and her husband, Mayo Coiner, were indicted on charges of making false federal income tax returns. They moved to dismiss the indictment on the ground that the prosecution had been initiated in retaliation for a sex discrimination suit that Ms. Adams had filed against the United States Equal Employment Opportunity Commission.

The motion to dismiss was supported by affidavits of a former employee of the EEOC and a former Internal Revenue Service employee. The latter affiant suggested that criminal prosecutions are unusual where, as in this case, there was no outstanding deficiency and the returns had been corrected by amendments filed well before IRS started investigating. The retired EEOC official, who had once been the director of the district office where Ms. Adams was employed as an attorney, expressed a belief that "the EEOC instigated and pushed the investigation and prosecution of Alayne Adams as revenge against her because she filed the discrimination complaint and the subsequent lawsuit against the EEOC and because she declined to settle the lawsuit."

The district court denied the motion to dismiss without allowing the defendants to conduct discovery on their retaliation claim

and without holding an evidentiary hearing. The case went to trial, and verdicts of guilty were returned against both defendants on the tax charges. Ms. Adams was also convicted on three counts of perjury in connection with testimony she had given at a deposition in her sex discrimination suit and at a hearing held before a magistrate in that suit on a motion to dismiss for discovery defaults.

Upon review we conclude that this is one of those rare cases where the defendants are entitled to discovery on the issue of whether the government's decision to prosecute was tainted by improper motivation. The case will be remanded to permit such discovery. The perjury convictions will be reversed, because we do not believe that the government sustained its burden of establishing the materiality of the allegedly false testimony.

I

Alayne Adams was admitted to the bar of Tennessee in 1975, and she hung out her own shingle in Memphis soon thereafter. In 1977 she married Mayo Coiner, a law professor of mature years who had been one of her teachers at Memphis State Law School. He assisted her in her practice, and, as the evidence indicated, he assumed responsibility for preparing the couple's joint income tax returns. The latter task was complicated by a recent divorce from his first wife, and Mr. Coiner fell seriously behind in preparing the returns. He testified, however, that he increased the amount of tax money withheld from his salary at Memphis State, and he believed that because of the increased withholding and his alimony deductions no back taxes would be due.

Early in 1979 Ms. Adams applied for a job as a lawyer in the legal unit of the Memphis office of the EEOC. She spoke with the head attorney there, and gave him a partially completed Form 171, the job application form commonly used in federal agencies. Ms. Adams had not filled

* The Honorable Arthur Spiegel, United States District Judge for the Southern District of Ohio, sitting by designation.

in a portion of the Form 171 relating to her earnings history, and she was told that she would need to provide that information because the form called for it. Ms. Adams testified that the head attorney told her to include in the statement of her earnings any money that was owing to her or that she knew she was going to get from a settlement. He also told her to put down her gross earnings rather than net income.

On March 17, 1979, Ms. Adams sent the head attorney a letter saying that she earned $15,723.40 in 1976, $21,919.45 in 1977, and $31,678.45 in 1978. The last figure, she testified, included a fee she anticipated receiving on the settlement of a lawsuit. Otherwise, she told the jury, the earnings figures she provided came from worksheets that she prepared for use by her husband in filling out Schedule C forms for the couple's income tax returns. She said she prepared the Schedule C worksheets on the basis of numbers she took from her checkbooks.

Ms. Adams was hired by the EEOC in mid–1979. At about the same time, according to Mr. Coiner's testimony, Mr. Coiner went to the local IRS office and explained that he was delinquent in filing his tax returns but wanted to bring himself current. IRS had not previously been aware that he was late in filing. At least four conferences were held with IRS, he testified, and it was agreed that all of the late returns would be filed by the end of April of 1980.

In the second week of April, Mr. Coiner testified, his contact person at IRS called and said there had been a change and the returns would all have to be filed on April 16. Mr. Coiner testified that he spent almost the entire night of the 15th working on the returns, and he had Ms. Adams sign the forms in blank before she went to sleep that night. She did not see the completed returns before they were filed.

In July of 1981 Ms. Adams filed her discrimination action against the EEOC. The head attorney was named as a defendant, along with the agency itself. Through her attorney, Ms. Adams was served with a request for production of numerous documents, including her income tax returns. She testified at trial that her attorney had not told her, before the government took her deposition, that she had been asked to produce her tax returns.

Ms. Adams was deposed on December 2, 1981. In the course of the deposition she was asked about the source of the numbers contained in her letter of March 17, 1979, to the head attorney. Her answer was as follows: "I took them off of the Form C that I had prepared for income tax purposes." During her trial Ms. Adams testified that she had not in fact completed a Schedule C in final form, but "I had done the Schedule C form worksheet in preparation for doing the income taxes." She further testified at trial as follows:

"Q. Did you believe that that answer was correct?

A. Yes.

Q. Even though you never yourself filled out a Form C itself, the official government form?

A. If I had—if I had thought that there was any problem with it, I—there wouldn't have been any reason not to say, I mean worksheet. I was using words, I don't know, careless I guess, but I was referring to what I had in fact done for income tax purposes. And I did believe that I was answering the question honestly."

Ms. Adams and Mr. Coiner had changed their place of residence shortly before the deposition, and they testified that some of their records were misplaced in the course of the move. They could not find copies of their old tax returns, and they made several attempts to obtain copies from IRS. Their attempts were unsuccessful, they said.

In July of 1983—at a time when, according to Ms. Adams, she had made production of several file boxes containing all the financial records she had—a hearing was held before a magistrate on a motion to dismiss the discrimination case for failure to comply with the government's discovery requests. Ms. Adams testified at the hearing that records supporting the gross in-

come figures she had given the head attorney were contained in the file boxes. Ms. Adams further testified that the figures were taken from her income tax returns, and that the business income she and her husband earned was reported on separate schedules, as she believed:

"Q. For the years you were married and also associated in practice, did you file separate schedules for your business income?

A. Yes, we did.

Q. Your income would be listed separately from his, is that correct?

A. Schedule C, I believe, yes.

Q. So, there would be a Schedule C for you and Schedule C for him, is that correct?

A. I believe it is."

Ms. Adams had never seen the returns themselves, according to her trial testimony, but she knew of no problem with them. She made it clear at the hearing before the magistrate that she had not personally prepared the returns, testifying as follows:

"I provided [Mr. Coiner] figures taken from my checkbook, broke it down into columns to be filled into the Schedule C."

Q. So you would have provided him income and expense figures to be used in determining Schedule C, is that correct?

A. That's correct.

Q. And the rest of them was left up to him to prepare?

A. That's right."

In January of 1984, according to the trial testimony, Ms. Adams and Mr. Coiner sought help from a certified public accountant in getting copies of their tax returns for the years in which the EEOC was interested. The accountant succeeded in getting copies of the returns from IRS, and it was then the defendants learned—for the first time, they maintained—that Ms. Adams' self-employment income had been omitted from the returns. Mr. Coiner testified at trial that he had "firmly believed that they contained every bit of reportable income that we had," and it was obvious that he had made "a pretty good mistake."

The accountant promptly prepared amended returns, which were filed in April of 1984. The amended returns showed an income tax deficiency of $3,344 for 1977 and $1,675 for 1978. The government does not deny that the deficiencies were paid in full, with all penalties and interest.

Early in 1985, as the trial record indicates, Mr. Eddie Daniel, a special agent of the Internal Revenue Service, was assigned to investigate possible criminal tax violations on the part of Ms. Adams and Mr. Coiner. It was Mr. Daniel who subsequently testified before the grand jury by which the defendants were indicted.

The indictment was handed up on February 27, 1986. Counts one and two charged that on or about April 16, 1980, Ms. Adams and Mr. Coiner willfully made and subscribed income tax returns for 1977 and 1978 that were false, the returns having failed to report income received by Ms. Adams in the private practice of law.

Count Three of the indictment charged Ms. Adams with having knowingly made a false material declaration at her deposition on December 2, 1981. The gravamen of the charge was that Ms. Adams had lied when she testified that the income figures furnished to the head attorney in March of 1979 had been taken from "the Form C that I had prepared for income tax purposes."

Counts Four and Five of the indictment charged Ms. Adams with having knowingly made false material declarations in her testimony before the magistrate in July of 1983. The gravamen of these counts was that Ms. Adams had lied in saying that the figures provided to the head attorney were taken from her income tax returns and that she "believed" separate Schedule Cs had been filed for herself and her husband.

In July of 1986 the defendants moved to dismiss the indictment. In the brief accompanying their motion they asked the court "to allow the defendants discovery of the complete background of the investigation and instigation of the criminal charges against the defendants," and the brief suggested that "[u]ltimately, upon a hearing when discovery is completed, the court

should dismiss this indictment" as having been brought in retaliation for Ms. Adams' discrimination suit.

The brief represented that "when Eddie Daniel interviewed Alan Chambers, civil counsel for [Ms. Adams], he told Mr. Chambers that his job was to find Ms. Adams guilty of something, no matter how small. He told Andy Gipson, a CPA assisting Mr. Coiner and Ms. Adams, essentially the same thing." These representations were not supported by affidavits.[1]

The defendants did submit an affidavit from Mr. Gipson stating, among other things, that he was a special agent in the Criminal Investigation Division of IRS from 1977 through 1982; that he had previously been employed by IRS as a tax auditor and Internal Revenue Agent; that he was familiar with the returns filed by Ms. Adams and Mr. Coiner for 1977 and 1978; that in his opinion "the omission of Alayne Adams' income from the joint returns filed by her and Mayo Coiner for the years 1977 and 1978 would not ordinarily constitute a criminal issue, due to the insignificant amount of her earnings and the resulting underpayment of income taxes;" that in his opinion "had Alayne Adams not brought suit against the Equal Employment Opportunity Commission, no criminal income tax investigation would have taken place with regard to her or Mayo Coiner and no indictment would have been approved by the Department of Justice Tax Division;" and that if the omission of Alayne Adams' earnings had been discovered by an Internal Revenue Agent or in the course of a tax audit, in Mr. Gipson's opinion "the matter would have been handled by the Civil Division of the Internal Revenue Service, with no criminal proceedings being required."

The motion to dismiss was also accompanied by an affidavit of Charles A. Dixon, who had been the director of EEOC's Memphis office prior to his retirement in May of 1986. Mr. Dixon said that he was aware of the existence of various confidential memoranda from the head attorney and others regarding the government's investigation of Alayne Adams and was also aware of contacts between the Department of Justice and Constance L. Dupre, Director of EEOC's Office of Legal Counsel. Mr. Dixon said that he was familiar with Ms. Adams' EEOC complaint, which had been "directed primarily at the actions of [the head attorney]." The affidavit went on to speak of the latter's "reputation for being unfair and vindictive towards people who 'cross' him, such as Alayne Adams." The final paragraph of Mr. Dixon's affidavit stated, in language quoted at the outset of this opinion, that Mr. Dixon believed the EEOC had "instigated and pushed the investigation and prosecution of Alayne Adams" in "revenge" for her having instituted discrimination proceedings. The affidavit concluded with a purported quotation from a confidential EEOC memorandum of April 26, 1985, to the effect that the then newly initiated tax investigation was under way "probably as a result of the Justice Department being informed by Constance L. Dupre, Director, Office of [EEOC] Legal Counsel, about these matters."

The government filed a brief opposing the motion to dismiss, and the defendants filed a reply brief. In their reply brief the defendants asserted that during the five years preceding the indictment of Ms. Adams there had been only ten indictments for perjury in the Western District of Tennessee, none of which indictments had arisen out of testimony in a civil case. The ten indictments were listed in an appendix to the brief. The brief also asserted that in the preceding five years no one had been indicted in the Western District for tax evasion where taxes were not still due at the time of the indictment. A purported list of the tax evasion indictments was attached to the brief.

After hearing oral argument the district court entered a written order denying the motion to dismiss, declining to grant an evidentiary hearing, and, by inference, re-

---

1. Under Rule 47, Fed.R.Crim.P., it has been stated that "in the absence of a court order, or a local rule requiring affidavits, it is not required that affidavits be submitted." 3A Wright, Federal Practice and Procedure: Criminal 2d § 802, p. 192.

fusing to allow discovery on the issue of retaliation. The court dismissed the affidavit of former EEOC Director Dixon as "rank supposition," and said that EEOC's motivation was not relevant in any event "[b]ecause the EEOC is not the charging party in a criminal tax prosecution." The court said that the affidavit of Mr. Gipson, the former IRS employee, was "uncorroborated and conclusory," while the defendants' summaries of prior indictments for perjury and tax evasion were "in many regards distinguishable and of questionable authenticity and accuracy." The court did not suggest that there had ever before been a prosecution comparable to this one, but did observe that "[s]urely the attorney for defendants may not deprive [sic] the grand jury of this district from returning an indictment because it does not match ... other cases."

The case went to trial in December of 1986, and judgments of conviction were entered on the jury's guilty verdict as to all counts in the indictment. Ms. Adams was given concurrent sentences of six months' imprisonment on each of the perjury convictions, and she was given a suspended sentence and placed on two years' probation as to the income tax counts. Mr. Coiner was fined $2000 and was likewise placed on probation for two years. (His conviction also resulted in entry of an order suspending him from practice before the district court.) This appeal followed.

## II

We fully agree with the district court's thought that the mere filing of a lawsuit against an agency of the federal government does not give anyone a license to break the law and insist that any ensuing prosecution be quashed as retaliatory. The Constitution confers no such immunity from prosecution. *Wayte v. United States*, 470 U.S. 598, 614, 105 S.Ct. 1524, 1534, 84 L.Ed.2d 547 (1985).

■■ It seems reasonably clear, however, that a prosecution which would not have been initiated but for governmental "vindictiveness"—a prosecution, that is, which has an "actual retaliatory motiva-

tion"—is constitutionally impermissible. *Blackledge v. Perry*, 417 U.S. 21, 27–28, 94 S.Ct. 2098, 2102, 40 L.Ed.2d 628 (1974). The broad discretion accorded prosecutors in deciding whom to prosecute is not "unfettered," and a decision to prosecute may not be deliberately based upon the exercise of protected statutory rights. *Wayte*, 470 U.S. at 608, 105 S.Ct. at 1531, citing *United States v. Batchelder*, 442 U.S. 114, 125, 99 S.Ct. 2198, 2205, 60 L.Ed.2d 755 (1979), and *United States v. Goodwin*, 457 U.S. 368, 372, 102 S.Ct. 2485, 2488, 73 L.Ed.2d 74 (1982).

■ All power tends to corrupt, as Lord Acton reminded us, and occasional misuse of what we have termed "the awesome power of prosecutors (and judges)" is by no means inconceivable. *United States v. Andrews*, 633 F.2d 449, 453 (6th Cir.1980) (en banc), *cert. denied*, 450 U.S. 927, 101 S.Ct. 1382, 67 L.Ed.2d 358 (1981). It is not only the inexperienced and the overly ambitious who may be tempted to misuse the prosecutorial power, although they are certainly subject to that temptation. There are times when the judgment of even the most highly qualified and virtuous of prosecutors—perhaps especially they—will yield to an excess of zeal. One thinks of the Massachusetts men who, in an age not so very far removed from our own, prosecuted witches.

Whether the power to prosecute was misused in the case at bar we do not know. The mere fact that one of the defendants had sued the EEOC does not, in itself, suggest any misuse. But the *datum* that Ms. Adams was putting her governmental employer to the trouble (and potential embarrassment) of defending itself against a discrimination charge does not stand alone. The record suggests, for one thing, that taxpayers who underreport their income and then voluntarily amend their returns and pay the deficiency have not heretofore been subjected to prosecution in the Western District of Tennessee—at least not within the memory of the district judge, whose tenure goes back to 1966. The record suggests, similarly, that prosecutions for perjury have not heretofore been

instituted in respect of testimony given in civil proceedings—a fact the significance of which increases, as we see it, in direct proportion to the thinness of the charges. (As we shall explain presently, the materiality of Ms. Adams' alleged prevarications is highly questionable.)

And there is more. The affidavit of Mr. Dixon, the former director of the EEOC office in Memphis, undoubtedly contains "supposition," but Mr. Dixon knows the *dramatis personae* as we do not, Mr. Dixon has seen confidential memoranda to which we are not privy, and Mr. Dixon states under oath that he believes the EEOC instigated the prosecution of Ms. Adams out of "revenge." Mr. Gipson, drawing on his lengthy experience as an employee of the IRS, states in his affidavit that he does not believe that criminal proceedings would "ordinarily" be instituted in tax cases of the sort presented here. Unless these men are perjuring themselves, their testimony raises a significant question as to why this particular prosecution was undertaken.

It is true, to be sure, that Ms. Adams' discrimination suit was brought against the EEOC and not against the IRS or the Department of Justice. But if the EEOC was able to prevail upon the Department of Justice to institute a prosecution that would not have been undertaken but for Ms. Adams' exercise of her statutory right to sue, it does not seem to us that EEOC's motivation is irrelevant.

Each situation of this sort will necessarily turn on its own facts, *Andrews*, 633 F.2d at 454, but where there has been a *prima facie* showing of "a realistic likelihood of vindictiveness," it is incumbent upon the district court to "conduct an evidentiary hearing where the government's explanations can be formally presented and tested." *Id.* at 457. And a criminal defendant "may ... be entitled to discovery on the issue of selective prosecution if he introduces ' "some evidence tending to show the existence of the essential elements of the defense." ' " *United States v. Schmucker*, 815 F.2d 413, 418 (6th Cir. 1987), quoting *United States v. Mitchell*,

778 F.2d 1271, 1277 (7th Cir.1985), and *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir.1974).

"Some evidence" of vindictive prosecution has been presented here. It is hard to see, indeed, how the defendants could have gone much farther than they did without the benefit of discovery on the process through which this prosecution was initiated.

It may well be that no fire will be discovered under all the smoke, but there is enough smoke here, in our view, to warrant the unusual step of letting the defendants find out how this unusual prosecution came about. It will be time enough for the district court to consider whether an evidentiary hearing should be held after discovery has been completed—and we are confident that the district court will not let the discovery get out of hand. Discovery should be confined to the narrow issue of whether the EEOC, acting on an improper motive, induced the Department of Justice to institute a prosecution that would not otherwise have been undertaken.

### III

Even if the inquiry into possible vindictiveness should avail them nothing, defendants suggest that they are entitled to a new trial because of allegedly erroneous evidentiary rulings made by the district court. In most of the instances in question the defendants failed to make an appropriate offer of proof, however, and having read the trial transcript in its entirety, we are not persuaded that a new trial would be warranted. On the whole, the defendants were given ample opportunity to get their story across to the jury.

### IV

We return finally to Ms. Adams' perjury convictions. The statute under which she was charged, 18 U.S.C. § 1623, makes it a felony for a person knowingly to give a false "material" declaration under oath in any United States court proceeding. We have accepted the view that materiality is an essential element of the crime, *United*

*States v. Quaisi,* 779 F.2d 346, 347 (6th Cir.1985), and whether the government has sustained its burden of establishing materiality is for the court to decide as a matter of law. *United States v. Bednar,* 728 F.2d 1043, 1047 (8th Cir.), *cert. denied,* 469 U.S. 827, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984). *Cf. United States v. Giacalone,* 587 F.2d 5, 7 (6th Cir.1978), *cert. denied,* 442 U.S. 940, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979) ("It has long been settled that the question of materiality in a perjury or false statement case is one of law for the courts to decide.").

■ The test of whether a false declaration satisfies the materiality requirement is whether a truthful statement might have assisted or influenced the tribunal in its inquiry. *United States v. Swift,* 809 F.2d 320, 324 (6th Cir.1987). With respect to the deposition testimony on which Count Three of Ms. Adams' indictment was predicated, the government has not persuaded us that the inquiry into the alleged discrimination against Ms. Adams would have been assisted or influenced in any material way if Ms. Adams had testified that the earnings figures furnished to the head attorney came from a Form C *worksheet* prepared for income tax purposes, rather than from an actual Form C that Ms. Adams had prepared for income tax purposes.

■ The issue in Ms. Adams' lawsuit against the EEOC was whether the agency was guilty of sex discrimination, not whether Ms. Adams was guilty of failing to prepare proper income tax returns. It was the government's burden in the perjury case to establish a nexus between the discrimination proceeding and the defendant's false statement by presenting some evidence as to the scope of the discrimination case. See *United States v. McComb,* 744 F.2d 555, 564 (7th Cir.1984). As we read the testimony of the EEOC trial lawyer who worked on Ms. Adams' discrimination case —and this is the only testimony which seems to have been designed to establish the necessary nexus—it does not adequately explain what difference it could have made in the discrimination suit whether Ms. Adams had actually prepared a Schedule C for income tax purposes or merely prepared a Schedule C worksheet.

As to the testimony on which Counts Four and Five of the indictment are based, that being Ms. Adams' testimony before the magistrate at the hearing held in 1983, the magistrate had called the hearing "to determine whether [Ms. Adams] had showed [EEOC] any records" covered by the document request. The tax returns had been requested to verify the amount of Ms. Adams' earnings prior to her employment by the EEOC. Ms. Adams' attorney contended that prior earnings were irrelevant—as the EEOC itself had evidently maintained, successfully, in *Kouba v. Allstate Insurance Co.,* 523 F.Supp. 148 (E.D. Cal.1981), a case decided two years earlier —but the magistrate's report and recommendation concluded that the EEOC was entitled to see the tax returns and that Ms. Adams had failed to produce what she was supposed to produce. The district court affirmed the magistrate's findings that the EEOC was entitled to discovery and that the agency was entitled to recover attorney fees in respect of its efforts to obtain Ms. Adams' records.

All this may be learned from the record of the criminal trial. What that record does not show, at least to our satisfaction, is how more precise answers by Ms. Adams to the questions asked her at the hearing before the magistrate could have had any significant influence on the magistrate's decision. If the magistrate had known that the income figures provided to the head attorney in 1979 came from worksheets rather than from final returns, would that have made it any more likely that Ms. Adams would be directed to produce the final returns in 1983? And if Ms. Adams did not in fact believe that her income had been listed on a separate Schedule C, would testimony to that effect have made it any more likely that she would be directed to produce the returns? We think not.

The government argues that the allegedly perjurious statements might be material to the issue of Ms. Adams' credibility. But this argument proves too much; the credibility of a witness is always at issue,

but not every word of a witness's testimony is invariably material. The materiality of a particular snippet of testimony is not automatically established by the simple expedient of proving that the testimony was given.

Ms. Adams' perjury convictions are REVERSED. The case is REMANDED for further proceedings on the question whether the prosecution of Ms. Adams and Mr. Coiner for making false tax returns was based on improper motives.