UNITED STATES of America

v.

Alayne Barry ADAMS and Mayo L. Coiner, Defendants.

No. 86–20083–02–M.

United States District Court, W.D. Tennessee, W.D.

April 8, 1993.

**1140**

Bill L. Barnett, Special Asst. U.S. Atty., Birmingham, AL, for plaintiff.

Kathleen L. Caldwell, Memphis, TN, for defendant.

Mayo L. Coiner, pro se, deceased.

## SUPPLEMENTAL JUDGMENT AND PROBATION ORDER

McRAE, Senior District Judge.

On March 26, 1987, there was entered on the docket sheet a Judgment and Probation Order in which the Court recorded that a verdict of guilty had been returned by a jury and thereby the defendant Mayo L. Coiner was convicted of the charge that he did willfully subscribe and cause to be made and subscribed false income tax returns and aided and abetted in the same; in violation of Title 26 U.S.C. § 7206(1) and Title 18 U.S.C. § 2 as charged in Counts 1 and 2 of the indictment.

The Court further recorded the imposition of a sentence which was suspended and the defendant was placed on probation for a period of two years. The defendant was also ordered to pay a fine of $2,000.

A timely appeal of the conviction of the defendant was taken to the United States Court of Appeals for the Sixth Circuit. The Court filed its opinion on April 3, 1989, and a rehearing was denied on June 5, 1989. 870

F.2d 1140 (6th Cir.) In its opinion, the Court of Appeals noted that this is one of those rare cases where the defendants are entitled to discovery on the issue of whether the government's decision to prosecute was tainted under the controlling principles of vindictive prosecution. The Court therefore remanded the case for the defendants to have discovery to which they were entitled in furtherance of a Motion to Dismiss Indictment Due to Retaliatory Prosecution and an evidentiary hearing on the Motion if the Court determined that such hearing was necessary after the completion of the discovery.

The Court of Appeals in its opinion affirmed the trial court in all other respects and noted that a new trial was not warranted because the defendants Coiner and Adams were given ample opportunity to get their story across to the jury. 870 F.2d at 1146.

For the reasons stated in the Court's Order Setting Evidentiary Hearing entered on October 7, 1992, the Court conducted an evidentiary hearing and has entered a Final Ruling on Remand Proceedings in which the Court concluded and held that the defendants have not established that the indictment should have been dismissed upon the grounds of vindictive prosecution. .

IT IS THEREFORE ORDERED that the Court reiterates its finding that the defendant Mayo Coiner was convicted of the offenses charged because he did willfully subscribe and cause to be made and subscribed false income tax returns and aided and abetted in the same; in violation of Title 26 U.S.C. § 7206(1) and Title 18 U.S.C. § 2 as charged in Counts 1 and 2 of the indictment, and the Court reimposes its suspended sentence and the placing of the defendant Coiner on probation for a period of two years and reimposes a sentence of a fine in the amount of $2,000 as to Count 1.

The Court takes judicial notice of the record in the cause that the defendant Coiner commenced his period of probation on March 13, 1987, and completed two years' probation on March 12, 1989. The Court further takes judicial notice of the defendant Coiner's having paid the fine of $2,000 on June 14, 1988.

IT IS THEREFORE ORDERED that the defendant Mayo Coiner stands convicted of two felonies for violation of 26 U.S.C. § 7206(1) as charged in Counts 1 and 2 of the indictment, and the defendant has satisfied his sentence of two years probation and the payment of a $2,000 fine.

The clerk is hereby directed to enter this Supplemental Judgment and Probation Order and the same shall be a Final Judgment subject to appeal if the defendant so desires.

### FINAL RULING ON REMAND PROCEEDINGS

The attorney for the defendants Adams and Coiner on July 3, 1986, filed in this criminal case a Motion to Dismiss Indictment Due to Retaliatory Prosecution (Motion to Dismiss), which sought pretrial discovery to permit the defendants to investigate the conduct of attorneys for the Equal Employment Opportunity Commission (EEOC) and the Department of Justice (DOJ) acting through the Office of the United States Attorney for the Western District of Tennessee. The discovery was sought in furtherance of the claim that EEOC and DOJ officials had caused the defendants to be indicted because Adams as an attorney for EEOC had filed a gender discrimination case against the EEOC and some officials in the Memphis office. The judge of the trial court denied the request for discovery and denied the Motion to Dismiss. Subsequently, the case was tried and the jury found the defendants Adams and Coiner guilty of subscribing to false income tax returns as husband and wife for the years 1977 and 1978 in violation of 26 U.S.C. § 7206(1). The Court of Appeals on April 3, 1989, filed its opinion which is reported as *U.S. v. Adams, Coiner,* 870 F.2d 1140 (6th Cir.1989). In doing so, the Court of Appeals noted that "this is one of those rare cases where the defendants are entitled to discovery on the issue of whether the government's decision to prosecute was tainted by improper motivation." 870 F.2d at 1141.

On August 8, 1989, there was entered on the docket sheet a Scheduling Order which set forth the scope, limits and time of discovery in order to comply with Court of Appeals remand decision. The trial court did not apply totally the discovery procedures in the Federal Rules of Civil Procedure; however, the discovery that was allowed, included interrogatories, motions to produce and oral discovery depositions under the approval of the Court as to scope. The Scheduling Order directed that the discovery should be expedited.

Regrettably, the discovery had hardly been commenced when delays were encountered. The first delay was occasioned by a motion by defense counsel to require this judge to disqualify himself. This was briefed, presented and denied. The next delay was occasioned by the motion of the defendants to disqualify the United States Attorney for the Western District of Tennessee and his assistants as the attorneys for the United States in further proceedings in view of their involvement in the issues in this case and in an EEOC discrimination case filed by Adams. This motion was granted, which necessitated having the DOJ appoint an attorney to handle the matter. Bill Barnett, Esquire, an Assistant United States Attorney for the Northern District of Alabama was appointed and has continued to handle the case during the entire remand proceedings. However, this has caused delay in view of his lack of short notice availability in this district for preliminary matters. Another cause of delay was the serious illness and surgery of the defendant Adams. Similarly, discovery was commenced but delayed due to the heavy trial schedule of the lead attorney for the defendants, Kathleen L. Caldwell, including her participation in another income tax case. Orders were entered officially extending the completion date for discovery.

After discovery was complete, the Court conducted a nonevidentiary hearing in order to let the attorneys for the defendants and the United States argue and advocate their respective positions as to whether or not an evidentiary hearing should be held. On October 7, 1992, this Court entered its Order Setting Evidentiary Hearing in which the Court observed on page 2:

Because some of the evidentiary material referred to in the Court of Appeals opinion was relied upon in order to explain

the entitlement to discovery as opposed to admissible evidence on the issue of improper prosecutorial motives, the Court has determined that an evidentiary hearing with witnesses subject to cross-examination is necessary to resolve the issues presented to this Court.

The ultimate determination to be made at the end of the evidentiary hearing was whether the portions of the indictment charging the defendants with making false income tax returns should be dismissed because the indictments had been obtained by "vindictive prosecution."

On November 30, 1992, the evidentiary hearing was commenced and was completed on December 2, 1992, after the presentation of 16 witnesses in person or by deposition. Counsel requested time to receive the transcript of the hearing in order to prepare the proposed findings of fact and conclusions of law. Whereupon the Court ordered opposing counsel to submit proposed Findings of Fact and Conclusions of Law (FFCL) simultaneously on January 29, 1993. The transcript of the hearing consists of 732 pages in four volumes. It was not completed until January 19, 1993. The Court granted an extension of time for filing the proposed findings of fact and conclusions of law to March 9, 1993, for the reasons set forth in Order on Motion for Extension of Time to File Findings of Fact entered on the docket on February 3, 1993.

### Introduction

In early 1979, the defendant Adams made application for a position of Trial Attorney in the office of the EEOC at Memphis, Tennessee. At that time, an applicant was called upon to indicate the amount of income that the applicant had received in the three years prior to employment. The Head Attorney called upon Adams to furnish the prior income, and she did so by letter dated March 17, 1979.[1] Adams was hired in mid–1979. In July of 1981, she filed suit against the EEOC for gender discrimination in her employment. The Head Attorney was named as a defendant along with the EEOC. In the course of

the civil lawsuit, Adams was deposed and was asked about the source of the amount of the income that she had received. In oral depositions and in a hearing before the magistrate, she established the source of the information as "Schedule C" of the respective income tax returns. The testimony and oral deposition before the magistrate later became the basis of an indictment against Adams for perjury and against Adams and Coiner for violation of 26 U.S.C. § 7206(1) by willfully making false statements on their income tax returns for 1977 and 1978. The indictments were returned on February 27, 1986, after the civil case had been tried.

Prior to the trial of the criminal case, the Motion to Dismiss was filed and denied. The Motion to Dismiss was based upon the theory of "vindictive prosecution" whereby the EEOC procured the investigation by the IRS and the United States Attorney's Office for the Western District of Tennessee as retaliation for Adams having filed the civil suit against the EEOC. Allegedly, the primary procurer of the vindictive prosecution by the EEOC was the Head Attorney. The theory of the EEOC being the procurer of the alleged vindictive prosecution was undoubtedly urged in the appeal of this case before the Court of Appeals. See discussion by the Court of Appeals on p. 1144 of 870 F.2d wherein the affidavit of Charles A. Dixon, District Director of the EEOC's Memphis Office, contained particularly strong accusations against the Head Attorney. Similarly, the Court notes that the Court of Appeals on p. 1146 of 840 F.2d directed this Court as follows:

> Discovery should be confined to the narrow issue of whether the EEOC, acting on an improper motive, induced the Department of Justice to institute a prosecution that would not otherwise have been undertaken.

After all of the discovery had been taken, including the oral deposition of the Head Attorney and Devon Gosnell, the Assistant United States Attorney who had been assigned to assist EEOC attorneys in the civil

---

**1.** The term Head Attorney is used in this ruling in furtherance of the reference that the Court of Appeals made in its opinion to the Regional Attorney in the Memphis office.

lawsuit, the lead attorney for the defendants, Ms. Caldwell, was asked by the Court who was the alleged vindictive prosecutor. She replied it was not the Head Attorney of the EEOC, but it was Devon Gosnell, who caused the grand jury investigation and resulting indictment to be procured. 2T–219.

### Definition of Vindictive Prosecution

Prior to the evidentiary hearing, the Court called upon the respective attorneys for the parties to state the authorities relied upon. Based upon those and the Court's own investigation, the Court concludes that the basic principles controlling a charge of vindictive prosecution are as hereinafter stated.

■ Due process prohibits vindictive prosecution, but a defendant is not required to show that the prosecution was "actually vindictive." However, a defendant must show a "realistic likelihood of vindictiveness" by the prosecutor. *Thigpen v. Roberts,* 468 U.S. 27, 104 S.Ct. 2916, 82 L.Ed.2d 23 (1984); *Blackledge v. Perry,* 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974). In *United States v. Andrews,* 633 F.2d 449, 455 (6th Cir.1980), the opinion of an *en banc* court stated:

> The mere possibility that prosecutorial or judicial conduct may be vindictive is insufficient to trigger judicial sanctions. It is only where the possibility of vindictiveness is substantial that *Pearce–Blackledge* sanctions are triggered. The simple fear on the part of a defendant that a prosecutor may be retaliating against him is insufficient, by itself. Put another way, the mere appearance of vindictiveness is not enough to trigger *Pearce–Blackledge* sanctions. The factual situation must pose a realistic likelihood of vindictiveness.

■ The Court's opinion in *Andrews* also noted that there are two factors which must be considered in the determination of the issue of "realistic likelihood of vindictiveness." First, the prosecutor's stake in deterring the exercise of some right. Second, was the conduct of the prosecutor vindictive in its nature? The standard of realistic likelihood of vindictiveness is an objective one—a reasonable person, not a defendant's subjective impressions. 633 F.2d at 454.

### Reasonable Vindictiveness of Gosnell

At the time of Gosnell's participation in the civil case of Adams against EEOC, she had been an Assistant U.S. Attorney in this Court approximately ten years. While she did not handle all of the income tax cases, she handled more than the other Assistant U.S. Attorneys.

Because the suit of Adams as an attorney against the EEOC and particularly the Head Attorney involved other EEOC attorneys in the office, it was inappropriate for the case to be defended by other attorneys in the Memphis office. Therefore, EEOC attorneys from other areas were assigned to handle the case. In accordance with a common practice, an Assistant from the United States Attorney's Office in this locality was also assigned to assist in the handling of the civil case against a U.S. government agency. The Assistant who was first assigned from the United States Attorney's Office for the Western District of Tennessee was Katherine Carlyle; however, during the early stages of the case, she announced her decision to go into private practice. Therefore, Gosnell was substituted as her replacement. Gosnell did not participate in all of the pretrial proceedings. She identified her role as "somewhat like local counsel."

Gosnell did not participate in an initial deposition of Adams in the civil case on December 2, 1982, when Adams was asked about the figures in her letter of March 17, 1979, wherein she replied she had taken them off Schedule C for her income tax returns. Gosnell was present in July 1983, at a hearing before the magistrate on a Motion to Dismiss the case for failure to comply with the government's discovery requests where the sources of reported income was asked.

In the civil case, the defendants sought through discovery to have Adams produce the income tax returns of Adams and her spouse, Coiner, for the years 1977, 78 and 79. In that civil litigation, Adams was represented by Alan Chambers, an experienced plaintiff's attorney in employment discrimination

cases. He was handling the case for Adams on a contingent basis; however, he became the attorney based upon his having been associated with Adams in the private practice of law before her employment with EEOC. The income tax returns were not produced, and an on-going series of negotiations and requests ensued between Chambers and Gosnell. Chambers gave Gosnell various reasons why he could not produce the returns such as the defendants could not find them or they didn't have them. In this process, Gosnell became suspicious that they were deliberately being withheld because there was something to hide and Chambers became suspicious that Gosnell's persistence indicated something detrimental to Adams in the civil case. The judge of this district who was handling the civil case ordered Adams to produce the returns. This did not prompt immediate action; however, ultimately Chambers told Adams and Coiner to obtain the returns primarily to see if anything was wrong. The returns were obtained, and in January 1984, Adams and Coiner sought help from a CPA in Memphis who discovered that not only were there no Schedule C's for the income of Adams, but also her income was not included on the return. This prompted the preparation of amended returns by the CPA and the filing of them resulting in additional taxable income and taxes for the years 1977 and 78.

On April 16, 1984, after the amended returns had been filed and all returns had been furnished to Gosnell, the deposition of Adams was taken again, and Gosnell participated therein.

Gosnell was called as a witness in the evidentiary hearing by the defendants. During the course of her testimony, she was asked what motivated her to request an investigation and permission to indict on the tax charges and perjury charges. Her testimony on pages 376 and 377 is as follows:

Q. As a result of having attended the second deposition of Ms. Adams, did you formulate an opinion with regard to whether or not she had testified falsely under oath?

A. I believed that she had at that point, yes.

Q. And did you develop a judgment with regard to whether you had observed tax violations?

A. Yes, particularly at that point I saw her amended returns, I had original copies of the original returns and her prior statements with respect to income, and there were clearly some major discrepancies which I felt made the original returns false.

Q. Based upon your oath of office, what duty, if any, did you feel compelled to follow?

A. I felt obligated to turn it over to the investigating agencies.

Q. And was that obligation for any other reasons other than your oath of office?

A. Well, certainly as a private citizen any violations that I would see, I would also feel obligated to turn over to the authorities, but as an Assistant United States Attorney I'm charged with enforcing the laws of the United States, so I have even a greater obligation in that position to turn over violations of the law to law enforcement authorities.

Q. Did the Equal Opportunity Commission in any way impose upon you an impetus to go forward with any type of prosecution,—Ms. Adams or Mr. Coiner?

A. No, they—they made no effort to influence me in any way.

### The Investigation

On January 21, 1985, Gosnell caused a letter to issue to the office of Chief of Criminal Investigation Division of IRS (CID) advising them of possible criminal tax violations and requesting that an investigative grand jury be authorized. 2T–250, 365; 3T–676 Ex. 5. The process for approval of a grand jury investigation requires several levels of consideration, the first is the office of Regional Counsel for IRS, where a decision is made based upon their analysis of the data supplied. 2T–335–337 Ex. 12. Regional Counsel sent their favorable recommendation to the Criminal Tax Division of the DOJ for the final review before the grand jury investigation can begin. 2T–331.

DOJ authorized the grand jury investigation. 2T–331–334 Ex. 11. When the grand jury has concluded its investigation, before a true bill can be sought, the CID special agent must prepare a special agent's report (hereinafter SAR). 4T–685. Special Agent Charles E. Daniel (SA Daniel) prepared the report, had it approved by his Group Manager and Chief and forwarded it to IRS District and Regional Counsel for their review and recommendation that then accompanies the SAR to DOJ. 2T–366 & 367; 4T–686–689 Ex. 13. Though it was a grand jury matter, it was required to be referred back to DOJ for approval or disapproval for prosecution. 2T–368–370; 4T–689.

During the DOJ review process, if approved for prosecution, DOJ specifies the charges, the verbiage for the indictment, the years to be charged and even the parameters for plea bargaining. 2T–351; 4T–690 & 691 Ex. 14. On December 31, 1985, Ms. Gosnell received the authority from DOJ to proceed with the prosecution. Ex. 14. The authorization reflected the reviewers that had analyzed the investigation and was accompanied by a memorandum for prosecution. 2T–372–374 Ex. 14. The response from DOJ was the usual procedure followed for all tax reviews. 2T–372.

### Defendants' Contentions Based upon Proposed Findings of Fact and Conclusions of Law

■ As heretofore indicated, the Court determined at the end of the evidentiary hearing that the Court would require proposed findings of fact and conclusions of law from the parties through their counsel. An extension of time for filing the proposed findings was requested by the defendants and granted by the Court. On March 9, 1993, there was filed in the cause the Proposed Findings of Fact and Conclusions of Law on Behalf of Defendants (FFCL of defendants). The conclusions are set forth on pages 7 and 8 of the FFCL as follows:

WHEREFORE, defendants submit that this Court should hold:

1. That the prosecutions in this action were contrary to the IRS guidelines as published in section 100 of the Internal Revenue Service Law Enforcement Manual IX.

2. That these prosecutions violated IRS guidelines because defendants had made a voluntary disclosure of their tax deficiencies prior to the IRS investigation and prior to Defendants knowing of that investigation.

3. That the prosecutions violated IRS guidelines by using different years and averages for the investigation and the prosecution.

4. That the prosecutions should be dismissed as defendants have shown that other taxpayers were not prosecuted under similar circumstances.

The FFCL of defendants does not assert any incident of retaliatory conduct on the part of Gosnell. In fact, the only time that Gosnell's name is referred to in the proposed findings is on page 2 thereof wherein an expert witness, Paul J. DesFosses undertook to testify that Gosnell misstated facts in order to discredit the defendants when she included in her request for a criminal investigation the fact that the records of the IRS did not show income tax returns had been filed by the defendants in 1981, 82 and 83. This information was obtained in an early search of the IRS records when the 81–83 returns were sought under the wrong name. This Court determined that this was irrelevant to the issues concerning 1977 and 78. During the progress of the investigation by the various officials of IRS and DOJ, the mistake was discovered, the basis for including those years in the request for investigation was eliminated from consideration, and possible indictment was never considered. The suggestion by the expert of the defendants that this tainted the investigation and caused the indictment for different charges in different years is not convincing.

The remainder of the proposed FFCL of defendants is confined to action or failure to act on the part of SA Daniel and other officials of DOJ and IRS over whom Gosnell had no control.

### Conclusions 1 and 3 of FFCL of Defendants

■ During the discovery period prior to the hearing, defendants requested that they

be given the proper law enforcement manual that was applicable to the prosecution which resulted from the investigation requested by Gosnell. The United States objected to furnishing the manual on the grounds that it was for employees and officials of IRS and DOJ and was confidential. The Court overruled the objection of the United States to furnishing any part of the manual and directed an appropriate official of the IRS to present the portions applicable to the prosecutions in this case *in camera*. Although the Court honored the request of the United States in disclosing the pertinent provisions of the manual, the Court became persuaded that any claim of confidentiality and privilege was compromised because one of the experts offered by the defendants to express an opinion on the appropriate guidelines obtained a copy of the guideline as it had been published in the National Law Journal and was readily available for reference in the law library of Memphis State University in Memphis, Tennessee. The Court found and holds that Law Enforcement Manual IX Section 131.1 (12–9–82), sets forth the pertinent provisions as follows:

> (1) ... the following criteria apply to income tax investigations:
>
> .     .     .     .     .
>
> (c) Criminal prosecution will be recommended under IRC 7206(1) only if the evidence indicates that the average yearly additional tax for criminal purposes would be $2,500 or more....
>
> (2) Investigative preference will be given to cases that span three prosecution years rather than cases involving violations provable as only one or two years. This preference is particularly relevant where an indirect method of proof is utilized to establish the tax offense.

The record reflects that no tax was due for 1979 on the basis of the original or amended return. The original return for 1978 for the defendants was false by more than $2,500 due to the failure to report any income of Adams. The original return for 1977 of the defendants was false for less than $2,500 for the year 1977 due to the absence of the income of Adams. When the two years were averaged, the additional tax omitted from the original returns was in excess of $2,500. The defendants assert that these guidelines required the averaging of 1979 return in which no tax was due because all three of the returns were filed in April of 1980. At the criminal trial, it was shown that Coiner had assumed the responsibility of preparing the tax returns for himself and Adams. He did not file returns when due for reasons advocated by him; however, he did not request an extension for filing the returns.

The defendants offered Harry William Laughlin, III, a tax attorney in Memphis, Tennessee, who was an attorney with the Chief Counsel's Office of the IRS in Washington, D.C. for five years, as an expert to corroborate the contention that the years 1977, 78 and 79 should have been averaged instead of just the two years 77 and 78. He was qualified as a tax attorney; however, there was no proof that he had ever applied or interpreted the guideline involved in this case. He did corroborate the government's position that LEM IX Section 131.1 set forth the proper guidelines. He testified that it was significant that all three of the tax returns for 77 through 79 were filed at the same time. On cross-examination, it was brought out that the guideline used the word "preference" to be given cases that span three years rather than one or two years. He acknowledged that the use of the word preference meant that cases involving three years would be investigated ahead of those involving two years.

The contention and proof of the government reflects that SA Daniel had been trained and had applied the guidelines as advisory and not compulsory. The authorization and investigation of the guidelines and the subsequent prosecutions do not contradict the wording of the guidelines, and the Court notes that the series of reviews of the reports takes into account numerous other factors that are significant to the policies of when an investigation will be authorized and when an attempt to obtain an indictment will be approved and authorized. This Court concludes that the defendants have not shown any realistic likelihood of vindictiveness by violation of or failure to comply with

the appropriate sections of the guideline manual applicable to this investigation.

### Conclusion 2 of FFCL of Defendants "Voluntary Disclosure"

■ This is claimed to be another IRS guideline violation. This is based upon the testimony of Paul J. DesFosses. The proposed FFCL of defendants quotes from 4T–629–632. The witness undertakes to state that there are four criteria to be considered in criminal investigations. One of these is voluntary disclosure of the violation by the proposed defendant. He testified that this is a reference to P–9–2 which is a reference to a manual that is not the one applicable to the prosecutions in the instant case. The witness testified that it was a voluntary disclosure because the taxpayers disclosed their violation of making a false statement in their original return by filing an amended return and paying increased tax for the false statement. The premise is based upon the fact that the IRS did not know that the first statement was false until the taxpayers told them. The witness could not find or furnish a definition of voluntariness in the guidelines. He used his own definition based upon his experience. The Court is of the opinion that the facts of this case do not show a totally voluntary disclosure of a violation. In the first place, they did not volunteer that the first return was willfully false which is necessary to establish a violation. Furthermore, the amended return was prompted by the attorney in the civil case insisting that the taxpayers obtain the original returns from IRS to find out what, if anything, was wrong with it based upon his suspicion caused by Gosnell's persistent efforts to have them furnish the original returns.

Additionally, the validity of the witness' opinion testimony as an expert is seriously damaged by his total confusion on Hearing Exhibit 31. Inquiry was made of him about LEM IV. He erroneously distinguished it from LEM IX, the one applicable to this case, as IV being for agents and IX being for lawyers. Furthermore, when he was shown Exhibit 31, he failed to notice that a portion he was reading was not applicable to the facts of this case, and he interpreted the portion that he thought was applicable erroneously.

No authority for voluntary disclosure being a bar to prosecution has been shown, and as noted above, this is alleged to be a guideline application which does not have the same validity and strength as a statute or a clear interpretation of a court. Therefore the Court concludes that proposed conclusion 2 of FFCL of Defendants does not establish a realistic likelihood of vindictiveness.

### Conclusion 4 of FFCL of Defendants "Other Taxpayers Under Similar Circumstances Were Not Prosecuted"

■ This is based upon a portion of the Court of Appeals opinion in this case set forth on page 1144 of 870 F.2d as follows:

The government filed a brief opposing the motion to dismiss, and the defendants filed a reply brief. In their reply brief the defendants asserted that during the give years preceding the indictment of Ms. Adams there had been only ten indictments for perjury in the Western District of Tennessee, none of which indictments had arisen out of testimony in a civil case. The ten indictments were listed in an appendix to the brief. The brief also asserted that in the preceding five years no one had been indicted in the Western District for tax evasion where taxes were not still due at the time of the indictment. A purported list of the tax evasion indictments was attached to the brief.

The sentence which refers to the assertion in the reply brief to the Motion to Dismiss concerning no indictments for perjury had arisen out of civil cases, was applicable only to Ms. Adams. The perjury counts against Ms. Adams were dismissed by the Court of Appeals for not being material to the issues in the civil case in the opinion of the Court of Appeals. Therefore this Court concludes that it is not relevant to the income tax charges against both defendants in Counts 1 and 2.

■ The second part of the above-quoted portion has reference to Appendix B. On page 3 of the brief, there is a statement that there had been 59 indictments for income tax

evasion filed in the Western District of Tennessee in the five years immediately preceding the indictments in this action. In the next paragraph of the brief starting on the bottom of page 3, there is the argument that only 11 of the 59 indictments were for failure to pay taxes of $10,000 or less, and in each of those 11 indictments the defendant was charged with active fraud. Section 7206 of the Internal Revenue Code is to be distinguished from 7201, which is the "tax evasion" section. A false statement under the penalty of perjury for prosecution does not require the prosecution to prove existence of any taxable income at all. *United States v. Carter*, 721 F.2d 1514, 1539 (11th Cir.1984). Therefore the tax evasion cases cited in the brief are not relevant. Furthermore the 10 cases that are listed in Appendix B to the brief involve active fraud such as the use of multiple social security numbers, non-existent dependents and the government was seeking to collect unpaid taxes or illegally obtained refunds. The crimes charged in this case were complete at the time the false return was made under the penalty of perjury in a willful manner.

The proposed FFCL of defendants indicates that the records in Appendix B to the brief and the allegations and lists have not been challenged. The compilation of the 59 cases is not made known, and it is apparent that the list of 10 cases does not address the same crimes that are in issue in this case. Furthermore, these records are not readily available due to their age and their having been forwarded to the archives for storage. It is not the responsibility of the government to challenge records or statements that do not support the contentions of the defendants to establish realistic likelihood of vindictiveness.

### Concerns Expressed by Court of Appeals on 870 F.2d 1144

First, the Court of Appeals notes that when SA Daniel interviewed Alan Chambers, lawyer for Adams in the civil case, Daniel allegedly told Chambers that it was his (Daniel's) job to find Adams guilty of something "no matter how small." The opinion on page 1144 indicates that Daniel alleg-edly told Andy Gipson, a CPA assisting the defendants, essentially the same thing. The opinion notes that these representations were in the brief and were not supported by affidavits. At the hearing, Alan Chambers was called as a witness by the defendants. During his testimony, he was tendered two forms of affidavits which were introduced as Exhibits 4 and 28 to the evidentiary hearing. He was recalled by the United States. When he first testified, he identified Exhibit 4 as an affidavit which he said was substantially similar to one he had signed and sworn to before SA Daniel in August of 1985. On recall, he was tendered Trial Exhibit 28 which is a copy of an affidavit which was tendered as Trial Exhibit 4. Exhibit 28 has the initials of Chambers on the second page to indicate where he made changes by striking portions of the affidavit and adding substitutions. Exhibit 28 is signed "Chambers 8–9–85," and is subscribed and sworn to before Charles E. Daniel, Special Agent, Internal Revenue Service. At the end of the affidavit, the affiant stated he had read the foregoing statement consisting of two pages and that the statements contained therein are "true, accurate and complete to the best of my knowledge and belief." Neither Exhibit 4 nor Exhibit 28 has any reference to the statement that Daniel told Chambers that his job was to find Ms. Adams guilty of something no matter how small.

The testimony on Chambers' first appearance in the evidentiary hearing was very comprehensive in the matter of his representation of Adams in the civil case. That included testimony concerning his interviews with SA Daniel. Chambers had met Daniel previously and testified that Daniel came to see him about this case on more than one occasion; however, he did refer to a specific interview when he as the lawyer for Ms. Adams was trying to obtain any information that he could in her behalf including what he could find out about the criminal investigation being conducted by Daniel. At the same time, Daniel was interviewing Chambers for the purpose of obtaining whatever information he could obtain from Chambers that would address his assignment as the investigating officer of Coiner and Adams. On

page 2T–175 in response to questions by Ms. Caldwell, the following is stated:

(Q) Did Mr. Daniel ever describe to you (Chambers) what his purpose was in investing [sic] Ms. Adams?

(A) Yes, he did. We had several discussions about—I was Ms. Adams' lawyer, I felt that the—well, and, of course, I wanted to—and my goal was to be persuasive on her behalf. And I was representing her interest, and there was no doubt about that, and he told me what his function was, and he told me that his function was to find her guilty of something no matter how small.

And then we even discussed that further, that I told him that he would have to find a factual predicate, and he said that is what he was looking for.

On cross-examination by Mr. Barnett for the United States, the following questions and answers are stated on page 178 of volume 2 of the transcript.

(Q) And are you as certain about that as you are about the fact that Eddie Daniel told you he was out to get her regardless of how small the tax consequences were?

(A) Well, again you are using the word certain. I'm not 100% certain of anything. I'm comfortable that that is my best recollection and that is what I honestly believe happened. Eddie Daniel never said I'm about to get her. He said his job was to convict her or get her convicted of something, no matter how small.

(Q) Now what is your testimony right now that his statement was to you on that occasion right now?

(A) His job was to get her found guilty or convicted of something, and then no matter how small is the best I can characterize it.

SA Daniel testified as the last witness in the case, and he definitely denied that he had stated that his job was to get her convicted of something no matter how small. Gosnell also denies that she assigned him that job. In the total circumstances, particularly the circumstances whereby Chambers and Daniel were both trying to obtain information and making remarks that probably were not literally accurate, the Court cannot find that a realistic likelihood of vindictiveness is shown based upon the criminal investigator's alleged remarks in the course of his investigation. Furthermore it must be noted that he had limited power to induce an improper indictment.

### Affidavit and Deposition of Andy Gipson

As noted above, the opinion of the Court of Appeals on page 1144 of 870 F.2d notes that the brief in support of the defendants' motion to dismiss contains a statement that Daniel told Andy Gipson "essentially the same thing" as he is said to have told Alan Chambers, namely that Daniel's job was to find Ms. Adams guilty of something no matter how small. This statement allegedly made by Daniel was also noted not to be supported by an affidavit.

On page 1144 of the remand opinion, the Court of Appeals did discuss an affidavit of Mr. Gipson that was in the record. Three portions of the affidavit were referred to in the Court of Appeals opinion, namely (1) "the omission of Alayne Adams' income from the joint returns ... for the years 1977 and 1978 would not ordinarily constitute a criminal issue due to the insignificant amount of her earnings ..."; (2) that in Gipson's opinion "had Alayne Adams not brought suit against the EEOC, no criminal income tax investigation would have taken place with regard to her or Mayo Coiner and no indictment would have been approved ..."; and (3) if the omission of Adams' earnings had been discovered by a Revenue Agent or in the course of a tax audit, in Mr. Gipson's opinion, "the matter would have been handled by the Civil Division of IRS, with no criminal proceedings...."

At the evidentiary hearing, Ms. Caldwell as attorney for the defendants announced to the Court that repeated attempts to serve a subpoena on Mr. Gipson who resides and offers his services as a CPA in Memphis, Tennessee, could not be served, and therefore he could not be offered as a witness at the hearing. His deposition had been taken for discovery purposes prior to the hearing by Mr. Barnett as attorney for the United States. Thirty-one pages of the approximate

**1150**

thirty-five pages of the deposition were read into the record. 3T–539. Regrettably most of the deposition is of little help due to the argumentative and sometimes uncooperative exchanges between Mr. Barnett as the attorney and Mr. Gipson as the deponent. The deposition does establish that Gipson was an auditor with the IRS from 1972 until 1976 and a special agent with the CID from 1977 until 1982. 3T–512. The deposition also verifies that Gipson was brought into the case to assist with the defense of the criminal investigation sometime in early 1985 when Jim McMahon was the defense attorney for the defendants. After McMahon no longer represented the defendants, Gipson continued to assist Kemper Durand who had been retained to handle the case after the indictment was returned. Durand was the attorney who filed the Motion to Dismiss. The following questions and answers about Gipson's pretrial affidavit appear at 3T–514:

(Q) How did it come about that this affidavit was drafted? Did you actually dictate this affidavit?

(A) I believe I spoke in generalities about the affidavit to Kemper Durand. The actual wording on there was dictated by Mr. Durand. I would imagine that it was, in fact, typed in his office.

(Q) How did it come about that this affidavit was created?

(A) Mr. Durand posed those questions and I responded. I don't suppose that I knew really what he intended to do with it at the time.

Later in the deposition, Mr. Gipson testified that he was billing the defendants on an hourly basis; however, he was reasonably certain that he made no billing for the affidavit because it didn't take but a few minutes. 3T–516.

Although Mr. Gipson did not retract his statement in the affidavit that the income from the joint returns filed by the defendants for the years 1978 would not "ordinarily constitute a criminal issue" due to the small earnings and resulting underpayment of tax, he did testify that the words "would not ordinarily constitute a criminal issue" used in the affidavit were not his words. 3T–532. Additionally, in response to a specific ques-

tion, he acknowledged that the amounts of income omitted and other circumstances fit within the guidelines for a prosecutable case under 26 U.S.C. § 7206(1). 3T–531.

The overall proof in the case establishes that Mr. Gipson was accurate in his statement in the affidavit that had Adams not brought suit against the EEOC no criminal investigation would have taken place and no indictment would have been approved; however, that does not establish vindictiveness. As heretofore indicated, Ms. Gosnell as an experienced prosecutor of income tax cases would never have learned of the strong possibility of there being a violation of 26 U.S.C. § 7206(1) by Adams and Coiner. As heretofore pointed out, she was motivated by her duty as an Assistant U.S. Attorney and as a citizen to seek to have an investigation made for possible prosecution.

Similarly, the portion of the affidavit which is based upon a hypothetical proposition that if the omission of Adams' earnings were discovered by an Internal Revenue Agent or in the course of a tax audit, "the matter would have been handled in the Civil Division." The facts in this case show that this matter was discovered in the course of Ms. Adams' testifying falsely concerning her income tax returns for 1977 and 1978 in a deposition in which Gosnell participated. Therefore the opinion of Gipson is immaterial because his supposition was not the case.

### *Affidavit of Charles A. Dixon*

■ Another affidavit that was discussed by the Court of Appeals on page 1144 of 870 F.2d was the affidavit of Charles A. Dixon which accompanied the Motion to Dismiss. No discovery was obtained from him by the defendants during the discovery period. At one point, the attorney for the defendants indicated that the defendants could not establish the whereabouts of Dixon and thought that the government should determine his whereabouts. Insofar as this was a request to the Court, it was denied because Dixon was located pretrial for purpose of the affidavit which accompanied the Motion to Dismiss. Furthermore there was no explanation of what attempts had been made to

find him by the defendants. The record including a portion of the evidentiary hearing causes this Court to discredit and give considerably less weight to the contents of the affidavit.

The Court of Appeals noted that Dixon stated in his affidavit that he was aware of the existence of various confidential memoranda from the Head Attorney regarding the government's investigation of Alayne Adams and was also aware of contacts between DOJ and Constance L. Dupre, Director of EEOC's Office of Legal Counsel. He further opined that he was familiar with the complaint of Adams against the EEOC which had been directed primarily at the actions of the Head Attorney.

The final paragraph of the affidavit stated that Dixon believed that the EEOC had instigated and pushed the investigation and prosecution of Adams in revenge for the institution of the discrimination proceedings. The affidavit concluded with a purported quotation from a confidential EEOC memorandum to the effect that the initiated tax investigation was "probably as a result of the Justice Department being informed by Constance Dupre, Director of EEOC Legal Counsel." The affidavit also included Dixon's opinion that the Head Attorney had a reputation for being unfair and vindictive towards people who cross him such as Adams.

The affidavit exclusively places the vindictiveness on officials of the EEOC and particularly the Head Attorney. As noted previously herein, counsel for the defendants at the commencement of the evidentiary hearing conceded that the Head Attorney was not the alleged vindictive prosecutor. Furthermore, there was no proof to support that Constance Dupre had been the vindictive prosecutor.

The record in the evidentiary proceedings includes a deposition of Walter S. Grabon who became District Director of the Memphis Office of EEOC in March 1985. Dixon worked under him for approximately a year and a half until Dixon retired. He found the work performance of Dixon erratic and far from the level of competence to be expected. Grabon rated him in his performance evaluation as a 1 which was the lowest of the unsuccessful rating. Although Dixon did perform adequately on some occasions, his overall performance was unacceptable. Grabon testified on one occasion that Dixon threatened him and told him if he did not leave Dixon alone, Dixon was going to shoot him. Grabon further testified that he was considering terminating Dixon at the time he retired. By way of redirect examination in the discovery deposition, Ms. Caldwell asked him if Charles Dixon although inept wasn't "basically a friendly, outgoing and sincere person." To which Dixon replied he thought he was generally friendly and outgoing, but he had "some question about his sincerity." In the total circumstances, the Court finds that the affidavit of Dixon is of little or no weight in the resolution of whether or not Gosnell acted with a realistic possibility of vindictiveness.

*Summary Conclusion*

This Court concludes that discovery was allowed to the defendants to the extent directed by the Court of Appeals in its opinion and even beyond to the extent that the discovery was not confined "to the narrow issue of whether the EEOC, acting on an improper motive, induced the Department of Justice to institute a prosecution that would not otherwise have been undertaken." This Court allowed broader discovery even though defense counsel acknowledged that the Head Attorney and EEOC officials were not the vindictive prosecutors. The Court conducted a three-day evidentiary hearing in order to have the record reflect all of the evidence that the defendants could find and determine whether or not the "some evidence" of vindictive prosecution that was presented to the Court of Appeals was adequate to require a dismissal of the indictment under the doctrine of vindictive prosecution. Without making a formal determination that the full discovery established a *prima facie* showing of "a realistic likelihood of vindictiveness," the Court proceeded with an evidentiary hearing. The Court has concluded that there has not been a showing of a realistic likelihood of vindictiveness and therefore the Mo-

tion to Dismiss should be and is hereby dismissed.